# Lehigh Valley Coal Company v. Searle and Stark Heirs, Appellants.

*Contracts—Leases—Coal leases—Royalties—Ambiguous terms—Contemporaneous construction—Forfeiture—Equity — Injunction.*

1. Where a coal lease provided that the lessee should pay "for all coal mined above the size of pea coal at the rate and price of 25 cents per ton of 2,240 lbs., and for pea coal 12½ cents per ton royalty until it is worth within 25 cents per ton of chestnut coal, and then to be 25 cents per ton," that the lessee should "pay quarterly for the first two years from the first day of April next, for not less than 4,500 tons each year, for the third year 9,000 tons......" and for increased amounts in subsequent years, and that if in any one year the lessee should pay for more coal than

he mined, he might thereafter mine the coal he had paid for without further charge, but did not provide what proportion of the small sizes should compose the minimum quantity to be mined annually by the lessee, the terms of the lease in this respect were ambiguous and the rule of contemporaneous construction by the parties was applicable.

2. Where in such case it appeared that for more than thirty years after the making of the lease, the minimum amount of royalties was computed by the parties on the tonnage of prepared sizes mined, not on prepared sizes and pea coal, the lease should be construed as providing that the minimum royalties should be so computed.

3. Where in such case the lease provided that upon the failure of the lessee to pay the rentals for 90 days, the lease, at the option of the lessor, should terminate and the lessor should have the right of reentry, the fact that the lessee, after making a proper tender of most of the rental due, failed to pay a balance amounting to $56.25 for 90 days after the rent was due, did not entitle the lessor to enforce the forfeiture, where the question whether the rental was due as claimed was reasonably in doubt and had not been legally ascertained.

4. Where it appears in a proceeding to revoke a coal mining lease that the lessee was in default in the payment of rent owing to his misconstruction of the lease, an injunction to restrain the lessor from enforcing the forfeiture provided by the lease is properly granted.

5. Equity will not permit a party to a contract to enforce it by means manifestly never intended and such as are clearly harsh and oppressive.

Argued Jan. 11, 1915.   Appeal, No. 187, Jan. T., 1915, by defendants, from decree of C. P. Luzerne Co., Dec. T., 1913, No. 12, in equity awarding an injunction, in case of Lehigh Valley Coal Company v. Fanny Searle Hays, Warner Searle, Raynsford Searle, Carrie Searle Welling, E. R. W. Searle, Executor and Trustee of W. S. Searle Est., E. R. W. Searle, Anna C. Searle, Barry Searle, Daniel Searle, Roger S. Searle, Ellen Searle, M. Irene Searle, Executrix of D. W. Searle Est., M. J. McCollum, Clara M. Searle, M. Coolbaugh, Administrator of Harriet Coolbaugh Est., Joanna Stevens, Mary L. Shoemaker, Lydia Stark Mosier, and Jennie

Stark Warner.   Before Brown, C. J., Mestrezat, El-
kin, Stewart and Frazer, JJ.   Affirmed.

Bill in equity to enjoin the forfeiture of a coal lease.
Before Fuller, P. J.

The opinion of the Supreme Court states the facts.

The court awarded an injunction.   Defendants ap-
pealed.

*Errors assigned* were in dismissing exceptions to
various findings of fact and law of the trial judge and
the decree of the court.

*R. W. Archbald* and *John P. Kelly,* with them *John R.
Halsey* and *John T. Lenahan,* for appellants.

*F. W. Wheaton,* for appellee.

Opinion by Mr. Justice Mestrezat, March 8, 1915:

We do not agree with the learned chancellor's inter-
pretation of the coal lease out of which this litigation
arises.   We think it was the intention of the parties
that the minimum quantity of coal to be mined annually
was coal above the pea size and to be paid for at a roy-
alty of twenty-five cents per ton.   The lease provides
that the lessee shall pay "for all coal mined above the
size of pea coal at the rate and price of 25 cents per ton
of 2,240 lbs., and for pea coal 12½ cents per ton royalty
until it is worth within 25 cents per ton of chestnut coal
and then to be 25 cents per ton."   The lessee further
agreed "to pay quarterly for the first two years from the
first day of April next, for not less than 4,500 tons each
year, for the third year 9,000 tons, for the fourth year
13,500, and for each and every year thereafter during
the continuance of this lease for 18,000 tons, the first
payment to be made on the first day of July, 1876."   If
in any one year the lessee paid for more coal than he had
mined he had the right at any time thereafter to mine

the coal paid for without further charge. There is noth-
ing in the lease which specifies what proportion of the
several sizes shall compose the minimum quantity to be
mined annually by the lessee. The question must be
determined from the provisions of the lease just quoted.
The contract was entered into on March, 1876, and must
be interpreted as of that date, and in the light of con-
ditions existing at that time. We must assume that it
was then mutually beneficial to both parties, whatever
may be the real fact at present. The owner desired to
have his coal developed with a view to securing a certain
minimum quarterly revenue, and the purpose of the
minimum clause of production was to require diligence
in the operation so as to effect that purpose. The lessee
was fully protected; if he failed to mine the minimum
quantity in any one year he had the opportunity to make
up the deficiency in subsequent years. At the time this
lease was made pea coal was regarded as rather an un-
known quantity as to the amount produced, and the
mining operations were conducted with a view to pro-
ducing and marketing the larger sizes of coal. The pea
coal usually went to the culm or dirt pile. This is quite
manifest from the fact that from 1879 to 1882 out of
400,000 tons of coal produced there were only 1,200
tons, 3-10 of 1 per cent., of pea coal. Of course, as ap-
pears in the lease, it was thought that at some future
time the amount of pea coal might be increased, and so
it was provided that when it was within 25 cents of
chestnut, full royalty should be paid for it. That pro-
vision, however, is a recognition of the fact that the
quantity of pea coal mined at that time was inconsid-
erable, and that the parties were dealing with ordinary
sizes in fixing the annual minimum of the product of
the mines. Again, if the learned court's construction
of the minimum clause is correct the minimum income
of the owners is made uncertain and will depend upon
the proportion of the prepared sizes and pea size mined
quarterly. The rate of royalty for pea coal was 12½

cents, and for all coal mined above that size, the rate
was 25 cents per ton. It is true, as the learned court
suggests, that the parties could have agreed specifically
that the minimum product should depend solely upon
the ordinary sizes, but it may be suggested that it is
equally correct that the parties, if they so intended,
could have declared specifically that the minimum out-
put should be composed of both the pea and ordinary
sizes. They made no specific provision in either case,
and hence the doubt arising over the interpretation of
this provision of their contract. We cannot infer, how-
ever, that they intended that the amount of coal pro-
duced quarterly or the value thereof should be left to
uncertain and shifting standards. On the contrary, we
must assume that they intended certainty both as to
the quantity of coal and the revenue to be received by
the owners therefrom. The uncertainty produced by
the court's interpretation of the contract would be not
only the relative proportion of the sizes produced but
the royalty to be paid thereon. The relative proportion
of the sizes would necessarily vary from time to time in
the course of mining, and the price of pea coal would be
constantly changing and could change from 12½ cents
to 25 cents as provided in the lease. There is no pro-
vision in the lease for determining the proportions of the
two sizes of coal, and it was certainly not the intention
of the parties to make the income of the lessors so un-
certain and to depend upon these contingencies. The
lessee was entitled to reimbursement for any deficit or
amount paid in excess of production, and such a shift-
ing standard, as suggested by the court below, would
certainly result in confusion in ascertaining and read-
justing the subsequent reimbursement.

There was nothing before the court below to warrant
it in fixing the relative proportion of the prepared sizes
and pea coal for the quarter for which the rental was
claimed in this case. It is true, that the ratio is based
on the relative production of the Maltby Mine for the

year preceding the controversy. There was no evidence showing the ratio in previous years. The ratio might have been greater or less than the year taken by the court as the standard to determine the product of pea coal and prepared sizes for the quarter in question. Nor was the standard by which the learned court fixed the relative proportion of the sizes of coal determined by the coal taken from the property in question. The standard was determined by the mine run from the several properties that were being operated from the Maltby Colliery. This clearly would not be fair either to the lessor or lessee. If the learned judge was right in making his estimate for the quarter on the relative proportions of the coal mined during the preceding year, he should have confined it to the proportion of coal produced from this property alone.

We think the contract was ambiguous, and that the settled rule of contemporaneous construction by the parties should be applied. The learned judge says: "Any one of these three alternatives (suggested by him) would plainly conform with the literal language of the minimum provision in this lease, thus creating ambiguity and presenting a proper case for construction by conduct unless the doubt is removed by considering the purpose of a minimum provision." It is conceded that the lease does not specifically provide whether the minimum product is to be of the ordinary sizes or of such sizes and of the pea size. This raises a doubt as to the proper interpretation of the contract, and if, it is left open for construction then clearly the conduct of the parties may be invoked to aid in ascertaining their intention. When the contract is equivocal and the doubt must be removed by construction, the settled rules of intepetation may be invoked, whether it be the conduct of the parties or any other established rule. The purpose of the parties may be definitely fixed by the language they have employed in their agreement, but if it is doubtful and must be ascertained by interpreting the

instrument, then clearly the parties have a right to invoke the aid of contemporaneous construction. Applying this rule, it is clear, that the minimum product was to be determined by the quantity of coal of ordinary sizes produced at the mine. Payment was begun under the lease on July 1, 1876, and a uniform royalty of 25 cents on prepared sizes was paid until December 31, 1909. For over thirty years, therefore, the lessee paid and the lessors received and receipted for the royalty on the minimum product on this basis. This was the interpretation that the parties themselves put on the contract for almost a third of a century. The lease did not speak specifically on the subject, but the conduct of the parties leaves no doubt whatever as to what it would have said had it spoken. What was in the minds of the parties more than thirty years ago when they wrote and signed the lease was determined by them within a few years thereafter, and that construction of their contract has been iterated and reiterated by their unmistakable conduct through the many years which followed. So far as this record discloses there is no explanation of this conduct which would weaken its force in the construction of the lease. The plaintiff company could have ascertained the relative quantities of pea coal and the prepared sizes at any time after it began its mining operations. It was not required to wait for more than a quarter of a century, and after more than one hundred quarterly payments of royalty had been paid, before it had the minimum product adjusted in accordance with its present contention. It is inconceivable that the officials of the plaintiff company were ignorant of any fact, during the many intervening years, which would have prevented the company from asserting that the minimum output of the coal on which royalty was to be paid was to be determined by the relative proportion of the pea and larger sizes. We cannot attribute to the officials of the company a failure to perform their duty for more than a quarter of a century by paying to the

lessors a minimum royalty to which they were not entitled under the lease. There is nothing in the lease which prevents the application of the rule of contemporaneous construction, and there is no case in the books in which the conduct of the parties more clearly determines the meaning of their contract. By their mutual conduct for more than a quarter of a century the parties have clearly defined what they meant by the language employed in their agreement, and the court is not at liberty now to declare that such was not their meaning. When we are asked to say what the parties meant or intended by their contract, said this court in Peoples Natural Gas Co. v. Braddock Wire Co., 155 Pa. 22, 25, it is entirely safe to point to their own construction of it, as evidenced by their course of dealing under it. In Sherman v. Consolidated Dental Co., 202 Pa. 446, 451, we said: "The parties themselves thus gave a practical demonstration of their mutual understanding of the agreement, which neither one can now be allowed successfully to dispute."

We are of the opinion that the parties intended, as disclosed by a proper interpretation of the lease, that the minimum amount of royalty should be computed on coal of prepared sizes, and not on those sizes and pea coal.

This was not a case for forfeiture, and the learned court below for a reason different from that suggested by it was, therefore, right in granting the relief prayed for in the bill. The plaintiffs were willing at all times to pay the amount of royalty due under the lease, and there was no default in making such payment which would justify the lessors in declaring and the court in sustaining a forfeiture. It goes without saying, we think, that the contract between the parties was open to doubt as to the proper basis on which the royalty due from the lessee to the lessors should be computed. The difference between the parties as to the amount due on the quarter of rent was $56.25, and for the nonpayment

of this small sum the lessors attempted to declare a forfeiture. This difference arose from the interpretation put upon the contract by the parties. If the forfeiture is enforced it means a possible loss, under our interpretation of the agreement, of $50,000 a year to the plaintiff company. Under these circumstances the cause for forfeiture of the contract should be clearly within the provision authorizing it. This clause provides that on failure to pay any installment of royalty for ninety days, the lease and all rights under it shall at the option of the lessors become forfeited. The right to forfeit is based upon the nonpayment of a very small amount of the quarterly royalty which the lessors claim to be due, and the lessee denies. The court below sustained the lessee's interpretation of the contract and held that it was justified in declining to pay the amount of the lessors' demand. The forfeiture clause in the lease manifestly, we think, never was intended to enforce a forfeiture under such circumstances. It would be against reason and good conscience to permit the lessee to annul the lease under the circumstances present in this case. The clause was intended to enforce the royalty due by the terms of the contract, and until that was legally ascertained, if reasonably in doubt, there could be no just or conscionable ground on which it could be permitted to operate. The effect of such a forfeiture would be wholly incommensurate with the harm done the lessee company by withholding the comparatively nominal sum claimed by it as a basis for declaring the lease void. Equity will not permit a party to a contract to enforce it by means manifestly never intended and such as are clearly harsh and oppressive. In Story's Equity (5th Ed.) Sec. 1316, it is said: "The whole system of equity jurisprudence proceeds upon the ground that a party having the legal right shall not be permitted to avail himself of it for the purpose of injustice, fraud, oppression or harsh and vindictive injury." Again in the same section it is said: "Where a

penalty or forfeiture is designed merely as a security to enforce the principal obligation, it is as much against conscience to allow any party to pervert it to a different and oppressive purpose, as it would be to allow him to substitute another for the principal obligation."

We are all of opinion that, for the reasons stated, the decree of the court below should be affirmed and it is so ordered. Costs to be paid by the parties in equal proportions.