# Philadelphia, Trustee, Appellant, v. The Lehigh Valley Coal Co.

*Contracts — Construction — Obscure provisions—Interpretation by act of parties—Coal royalties.*

1. Where some of the provisions of an agreement are obscure, and are susceptible of two different meanings, the interpretation which the parties have placed thereon, and upon which they have uniformly acted for a considerable period of time, will be regarded as the proper one, and will be enforced by the courts.

Argued April 18, 1927.  Before FRAZER, WALLING, SIMPSON, KEPHART and SADLER, JJ.

Appeal, No. 11, Jan. T., 1928, by plaintiff, from judgment of C. P. Schuylkill Co., Jan. T., 1924, No. 83, for defendant, on case tried by the court without a jury, in suit of Philadelphia, trustee under will of Stephen Girard, deceased, v. Lehigh Valley Coal Co.  Reversed.

Assumpsit for coal royalties.  Tried by KOCH, J., without a jury.  BERGER, J., dissented.

The opinion of the Supreme Court states the facts.

Judgment for defendant.  Plaintiff appealed.

*Error assigned,* inter alia, was judgment, quoting record.

*Francis B. Bracken,* with him *Francis E. Brewster, Hazleton Mirkle* and *Daniel W. Kaercher,* for appellant. —Defendant is precluded from questioning plaintiff's construction of the leases by reason of its acquiescence in this construction for a period of years and by reason of the course of dealing based upon this construction, to which defendant expressly agreed: McKeever v. Coal Co., 219 Pa. 234; Lehigh Val. Coal Co. v. Searle, 248 Pa. 385; McMillan v. Titus, 222 Pa. 500; Thatcher v. Ry., 35 Pa. Superior Ct. 615; Thomas v. Refractories Co., 226 Pa. 136; Sherman v. Mfg. Co., 202 Pa. 451; Drake v. Lacoe, 157 Pa. 17.

*F. W. Wheaton,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, May 16, 1927:

This is an action to recover the sum of $7,106.91, alleged to be a balance of royalty due for coal mined by defendant from property of plaintiff, during the month of April, 1923.  Admittedly, defendant owes either the whole amount, or nothing at all; because the court below decided nothing was due, plaintiff appeals.

Being the owner of a number of anthracite coal prop-
erties, plaintiff leased some of them to defendant, and
the others to third parties, all the leases being for the
term of fifteen years from December 31, 1913. They pro-
vided that the several lessees should each month pay to
plaintiff a royalty on the various kinds and quantities of
coal mined during the preceding month, the amount of
royalty per ton being fixed at a certain percentage of
the average selling prices of all the lessees during the
preceding year. The leases then further proceeded as
follows:

"The average selling price per ton of each size of coal
at the breaker shall be obtained by taking the prices per
ton at the breaker received by each of the colliery les-
sees on the Girard Estate, and by applying these prices
to the shipments made at each price by the said lessees.
The selling prices shall be the gross selling prices at the
breaker without any deduction for expense of selling, or
for any expenses incurred after the coal is shipped, or
for allowances, rebates, claims, demurrage, short
weights, cost of storage, etc., and if, in making the sale
of the coal, the selling price agreed upon shall include
delivery at any point other than the breaker of the col-
liery at which the coal is mined, then the selling price
for the purposes of this lease, shall be the price so agreed
upon, less only the net freight due to or charged by the
railway or other transportation agent which carries
said coal to such other point of delivery. It is also ex-
pressly understood and agreed that the selling prices of
coal at the breaker as returned by the lessee to the les-
sor shall be the full prices received for the coal prepared,
shipped or sold by it, and shall include all allowances,
rebates, drawbacks, or any other form of payment made
to it by any individual, corporation, financial agent, coal
sales company, or any other party to whom or in whose
interest the coal from the demised premises may be sold
or consigned. It is also understood and agreed that no
sale made to any party or parties, controlled by the les-

see herein, or subject to the same control as the lessee, or in which the lessee shall have any interest, direct or indirect, or which shall hold or control any interest direct or indirect in the lessee, shall be admitted or used in determining the selling price of coal, except with the consent of the lessor, but that such sale or sales may, at the option of the lessor, be entirely omitted in making the calculation to determine the average selling prices of coal at the breaker upon which to base the royalty rates." It is clear, from these provisions of the lease, that the intention of the parties was that the law of supply and demand, unaffected by conditions personal or peculiar to any of the lessees, was alone to operate in determining the "average selling price" of the coal to be mined from plaintiff's properties.

When the leases were made, the Lehigh Valley Railroad Company owned all the stock of defendant; and nearly all the stock of the Lehigh Valley Coal Sales Company was owned by stockholders of the Railroad Company. At that time also there was an outstanding agreement, dated March 1, 1912, between defendant and the Sales Company, whereby the latter leased from defendant all its storage yards, plants and facilities, theretofore used for storing, handling and marketing its coal, and agreed to purchase from defendant (and the latter agreed to sell to the Sales Company), at a fixed percentage of the price at tidewater, all the coal mined, bought, or otherwise acquired by defendant (except such as might be needed by defendant's employees, or by dwellers in the neighborhood, and which could be taken away in wagonload lots or less), and to purchase no other coal elsewhere. The effect of this was to place defendant at the mercy of the Sales Company, so far as the sale of defendant's coal was concerned, for it had no place in which to store any of it, and no other purchaser could buy any material part of it.

In March, 1914, the government began a suit in equity against these three companies, inter alia, alleging that

the arrangements between them constituted a violation of the Sherman Anti-Trust Act, and the commodities clause of the Interstate Commerce Act. This suit resulted in an opinion by the Supreme Court of the United States, filed December 6, 1920, (United States of America v. Lehigh Valley R. R. Co. et al., 254 U. S. 255), sustaining the government's contention, decreeing that the several companies should not continue to hold stock of any of the others, that there should be no interlocking directorates, and, as respects the above agreement of March 1, 1912, that "all contract relations between the two companies [defendant and the Sales Company] be enjoined, which would serve in any manner to render the Sales Company not entirely free to extend its business of buying and selling coal where, and from and to whom it chooses, with entire freedom and independence, so that it may in effect, as well as in form, become an independent dealer in coal, and free to act in competition, if it desires, with the defendant coal company or railroad company." Evidently defendant was pleased with the existing status, and did not desire to make any change.

Pending these proceedings, defendant sold to the Sales Company all the storage yards, plants and facilities for storing, handling and marketing defendant's coal, which, as stated above, had theretofore only been leased, thereby perpetuating its condition as a mining company only, unless, indeed, at a prohibitive expense in obtaining other storage yards, plants and facilities. After the opinion of the Supreme Court of the United States was handed down, and in an alleged compliance with the indefinite provisions of it, as above quoted, defendant sent to the Sales Company a letter, referring to that decision, specifying that "until further notice" defendant would sell its coal to the Sales Company at certain prices therein named. From time to time similar notices were sent to the Sales Company; but, with this exception and a change in the personnel of the directors,

the relations between the two companies continued as theretofore. Indeed the price for the coal "until further notice," was at times a shifting one, whenever it was necessary for the Sales Company to have it so, as witness this extract from a letter written by defendant to the Sales Company: "We further agree that in such cases as you find it necessary to make reasonable concessions in your circular prices for buckwheat, rice and barley, in order to secure important contracts, we will adjust our prices for the tonnage of these sizes shipped under said contracts so that you will be able to obtain a margin of not more than ten cents per ton between our price to you and your actual price to your customer; this, however, with the understanding that these contracts will in each case be submitted to us for approval as to time and price, and that our comptroller will be given an opportunity to verify figures from your sales accounts."

Defendant's president, in an endeavor to explain away the fact that it had sought no other purchaser for its coal, testified, at the trial in this case, that it had to sell all the coal to the Sales Company, because there was no other agency capable of handling so large a quantity, viz., about 6,500,000 tons a year. As a practical proposition, it is certain that, with no place to store the coal and with no facilities for handling or selling it, defendant had to either sell it all to the Sales Company, or to quit mining, in whole or in part; and hence, so far as concerned defendant's actual business independence of the Sales Company, it did not exist in any greater degree after its supposed compliance with the opinion of the Supreme Court of the United States, than it did before. One cannot read the testimony of that witness, without concluding that it proved, and attempted to excuse the fact, that the business relations of the two companies had not at any time been altered in a material respect. This brings us directly to a decision of the point in controversy in this case.

From the inception of the relations between plaintiff and defendant, growing out of the lease now being construed, a controversy existed as to whether or not the selling prices of defendant to the Sales Company should be considered in determining the royalty rate on the coal mined by the lessees, including defendant. This controversy was adjusted by an agreement between the parties, set forth in a letter from defendant to plaintiff, dated June 21, 1916, and specifying that defendant "(in order to avoid further controversy and to amicably dispose of the matter) is willing to accept as a basis for fixing the royalty rates, the average of all the selling prices returned by all the other mining lessees of the Girard estate." This excluded the selling prices of defendant to the Sales Company, as plaintiff has all along claimed should be done.

It will be noticed that the letter does not specify the time during which defendant "is willing to accept [that] basis for fixing the royalty rates." The writing being thus uncertain and obscure in the respect stated, three possibilities arise: (a) that it was intended to apply only to the amount then due from defendant to plaintiff, as the court below held; or (b) that it was intended to apply only to such amounts as should become due while the relation between defendant and the Sales Company, as set forth in their agreement of March 1, 1912, should remain in effect, as defendant seems to contend; or (c) that it was intended to apply so long as the lease between defendant and plaintiff continued in effect, that is, it was an amendment or interpretation of the lease, as plaintiff claims. It is a little difficult to understand how "further controversy" would be avoided by a settlement leaving the same controversy open, month after month, during the twelve years the lease had yet to run; yet this is the necessary result of the conclusion of the court below. As concerns defendant's contention above, it may be said that there is nothing in the letter which in any way refers to the agreement of March 1, 1912, or

to the relations between defendant and the Sales Company, as set forth in that agreement; and, as we have already pointed out, so far as it affects plaintiff, such changes as were made, were of no moment whatever. This would seem also to answer defendant's contention; but we need not pursue either phase of the matter further, since there is a principle of law which is controlling under the circumstances here.

The letter being silent regarding the point in dispute, the true construction of the agreement specified in it, is to be ascertained, if possible, by the construction which the parties themselves have uniformly placed upon it: McKeever v. Westmoreland Coal Co., 219 Pa. 234; McMillin v. Titus, 222 Pa. 500; Lehigh Valley Coal Co. v. Searle, 248 Pa. 385. From the time the lease went into effect, until the time when the present dispute arose, covering a period of between nine and ten years, through all the mutations and changes which took place, including in that period seven years after the letter of June 21, 1916, was written, and more than two years after defendant's alleged compliance with the opinion of the Supreme Court of the United States, defendant continuously, month after month, paid in accordance with plaintiff's contention, (c) as above, without any dispute as to plaintiff's alleged right. So far as this record shows, neither orally nor by writing, did defendant, between June 21, 1916, and the time when the present controversy arose, ever challenge the accuracy of plaintiff's calculations, made in accordance with the agreement set forth in the letter of that date, nor, indeed, did defendant ever assert that this agreement was anything less than an amendment or interpretation of the lease itself. For these reasons the uniform construction by the parties must prevail, and defendant cannot now effectively set up its attempted defense.

The judgment of the court below is reversed, and the record is remitted with directions to enter judgment in favor of plaintiff and against defendant, for the sum of $7,106.91, with interest from May 20, 1923.