## Atlantic Refining Company v. Graham

*English, Quinn, Leemhuis & Plate*, for plaintiff.

*William W. Knox*, for defendant.

EVANS, P. J., June 28, 1949.—This is before us on a motion for new trial and for judgment n. o. v. after verdict for plaintiff in an action of ejectment to recover possession of property belonging to plaintiff and located at the northeast corner of Twelfth Street and Kahkwa Boulevard in the City of Erie. The facts involved are substantially as follows:

434

In the year 1945 John William Groters, Theodore Hummel and Leo E. Reffner, as partners in the sale of gasoline and other petroleum products, operated two stations, one located at Twelfth Street and Kahkwa Boulevard and the other at Twenty-sixth Street and Powell Avenue. In June 1945 Groters and Hummel received notice to appear for physical examination prior to induction into the armed services. Actual induction of both of these men took place in July of that year. In June of 1945, anticipating the fact that these two partners would be required to go into the armed services for an indefinite time, contact with defendant was made which eventually led to a written agreement dated July 9, 1945, by which the gasoline station at Twelfth Street and Kahkwa Boulevard was leased by the three partners to defendant, "for the term of the duration and four months from the 9th of July, 1945". Groters returned on leave of absence in September or October of 1945 and at that time called on defendant and had conversation with him concerning the return of the gas station. Graham at that time said he would surrender the existing lease but wanted another lease for a year in order that he might have a summer period which would be more profitable, more gasoline being used during the summer months and gasoline rationing having been discontinued on August 14, 1945. Groters would not consent to this arrangement. In December 1945, after his discharge from the Army, Groters again spoke to defendant about the surrender of the lease, at which time defendant stated that his lease lasted until after the peace treaty or peace treaties were signed. According to the testimony, defendant uses the words "peace treaties". And his answer was with reference to "peace treaty". Otherwise, and on at least 14 occasions during the trial, defendant referred to "the war", without distinguishing this term as applied to

the three wars in which the United States was engaged. Groters, who had signed the original lease but was not present when it was delivered on July 9, 1945, testified that he was stunned by defendant's interpretation and stated to him that he would have to go back and talk to his partners about it. Hummell had been injured and was in a veterans' hospital. No further conversations between the parties were had. Groters testified in this respect as follows:

"There was nothing we could do at that moment. We were not in a position to take the station back. Not knowing legal matters and law we figured that we would leave Mr. Graham in there, and as long as the lease was up we could put him out any time we wished to. We were not in a position to take the station back because there was only two of us, Mr. Hummell was not discharged."

Rent thereafter was regularly accepted until May of 1947 when the station was sold to the Atlantic Refining Company, present plaintiff. This company accepted rent from September of 1947, after giving written notice, however, that it was not acknowledging the lease and was accepting rent for use and occupation only until possession of the property could be regained. Defendant, maintaining that his lease continued until official termination of the war, refused all demands for repossession, and this suit followed.

The court will take judicial notice that Italy signed a military armistice with the United Nations on September 3, 1943, and surrendered unconditionally on September 8, 1943; that Germany surrendered unconditionally on May 8, 1945; and that Japan accepted the allied surrender terms on August 14, 1945, and signed the articles of surrender September 1, 1945. A treaty of peace with Italy was ratified by the Congress of the United States on June 5, 1947, and by Italy on September 6, 1947. No peace treaty has been ratified with Japan or Germany. Defendant contends that

the term "for the duration" means that the lease is effective until hostilities with all nations involved have been ended by official declaration by the Congress of the United States. In certain contracts and under certain circumstances this may be true, but such is not the case under situations similar to that involved in the present controversy. That term, insofar as it applies to the duration of a lease agreement, has been given its ordinary and usual meaning in the sense of cessation of actual hostilities rather than a strict legal meaning that would consider the war in existence until signing of treaty: Michael Tuck Foundation v. Hazelcorn et al., 65 N. Y. S. (2d) 387; Rupp Hotel Operating Co. et al. v. Donn, 158 Fla. 541, 29 S. (2d) 441; Glantz et al. v. Willow Supply Company et al., 139 N. J. Eq. 523, 53 A. (2d) 346; Stanmeyer et al. v. Davis, 321 Ill. App. 227, 53 N. E. (2d) 22.

"For the duration", under the testimony submitted here, is subject to three interpretations. As indicated hereinbefore, defendant's interpretation was that the lease must continue until a date four months following an official declaration that the three wars have ended. His theory is apparently that "the war" with three nations must be considered as one conflict. Two of the original lessors testified that the conversation and understanding concerning the term was that the lease should continue to a date four months following the end of gas rationing. Other portions of their testimony indicated this as being the time when hostilities would end and they would be in a position to again operate their station as they did prior to their war service. Although a writing cannot be contradicted or varied by parol evidence, its meaning when doubtful and ambiguous may be so determined. Such evidence is restricted to the interpretation of the language used: Baker's Trust Estate, 333 Pa. 273.

The court instructed the jury that it must, from the writing in evidence and the oral testimony concerning it, determine what was understood by the words used at the time the written lease was executed. Instruction was given that if "for the duration" was meant by the parties to be until the time when Congress should officially declare the war ended, the verdict must be for defendant. Instruction was also given that if the parties intended the lease to terminate four months after gas rationing had ended or hostilities had ceased, the verdict must be for plaintiff unless, the meaning of the writing being doubtful, plaintiff must now be refused possession from the fact that the original lessors were bound by the lessee's expressed understanding or interpretation and the acceptance of rent thereafter without protest from December 1945 until May 1947. The jury refused to accept defendant's version of the agreement and found for plaintiff.

Defendant's second contention is that, admitting only for the purpose of argument that the contract is capable of two or three interpretations, it was acted upon by the parties themselves according to his understanding for such time that it must now be accepted by this court as the proper interpretation of the true intent and meaning of the parties. Cited as authorities are several cases including Gillespie v. Iseman, 210 Pa. 1; McMillin v. Titus, 222 Pa. 500; Philadelphia v. Lehigh Valley Coal Company, 290 Pa. 87; Collison v. Philadelphia Company, 233 Pa. 350; Meehan v. Connell, 318 Pa. 481. An examination of this line of authority shows that in each instance where the interpretation of ambiguous language has been accepted by the parties and was enforced by the courts, the interpretation has been clear and without any element of doubt with regard to it. In Baker's Trust Estate, supra, the court held:

"Even if the contract were ambiguous, as the court below probably concluded, the subsequent conduct of the parties, *which makes clear their interpretation*, is admissible to clarify the language used." (Italics supplied.)

As said in Michael Tuck Foundation v. Hazelcorn, supra, the term "for the duration of the war" is indefinite because this country was at war with several nations—Japan, Germany and Italy—and the lease did not refer to which particular war of the several in which we were engaged. In Stanmeyer v. Davis, supra, the court, quoting Blackstone, held that the term of every lease must have a certain beginning and a certain ending, and although it need not state the actual period during which the tenancy is to endure it must in lieu thereof fix such period as may be ascertained at any time.

In our opinion, defendant's interpretation, conveyed to one of the original lessors in December 1945 is as indefinite and ambiguous as was the original writing which created the tenancy. The lessors must be held to defendant's interpretation, if at all, by way of estoppel or waiver only. To attain this technical advantage defendant must support his position by showing that the original lessors, in effect by the acceptance of rent, bound themselves to an oral interpretation which was so clear and free from ambiguity that it could be sustained were it one under which the tenancy was originally created. This he has not done. It may well be that as contended by plaintiff the court should have, as a matter of law, declared the tenancy to be one at will rather than for any definite term. However, in sustaining the jury's verdict the same result is obtained.

Defendant further complains that the court erred in its charge, specifically affirming plaintiff's seventh and eighth points to the effect that if the parties understood the words in question meant "duration of hostilities"

then the jury must find for plaintiff. Standing alone, this objection would be valid. However, in the general charge this instruction was qualified by further instruction that the jury should consider whether or not in December 1945 and thereafter, the lessors accepted defendant's interpretation of the contract so as to be bound thereby. Answering defendant's points subsequently, the court again charged that plaintiff would be so bound if the jury determined that the lessors did accept defendant's version. And at the very end of the charge, after discussing all of the points submitted, the court again stated that notwithstanding the original intention of interpretation of the parties, plaintiff would be bound by defendant's interpretation if, in the jury's opinion, by the acceptance of rent the lessors so indicated acquiescence thereto. In our opinion, the unqualified affirmance of plaintiff's seventh and eighth points in no way misled the jury as to the matters before it for determination.

The fourth contention is that counsel for plaintiff, in his address to the jury, made remarks of disparaging character toward defendant's counsel which justified the withdrawal of a juror. The remarks of plaintiff's counsel were not directed toward defendant's counsel. He said nothing about Mr. Knox or the advice defendant's counsel might have given. Mr. Quinn said only that he himself would be rightly classified as a scoundrel, under the circumstances of this case, if he interpreted the word "duration" as meaning an extension of time to the ratification of peace treaties. The argument concerning this episode left the jury in a position to properly determine the matter without prejudice, and in our opinion it did so.

And now, to wit, June 28, 1949, the rules granted October 16, 1948, on defendant's motions for new trial and for judgment n. o. v., are discharged and the prothonotary is directed to enter judgment on the verdict upon payment of the jury fee.