## Shoemaker's Account.

*Mines and mining—Lease—Distribution of royalties under coal lease—Trusts and trustees—Accounting—Estoppel—Construction of contract — Acquiescence in scheme of distribution — Barrier— Pillars—Act of June 2, 1891, P. L. 182.*

1. If one, knowing his rights, sees another acting in a mistaken notion as to the former's acquiescence therein, he may be estopped from subsequently objecting.

2. When a party with full knowledge, or with subsequent notice or means of knowledge of the rights and all the material facts, remains inactive for a considerable time, or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable.

3. Where several owners of contiguous coal lands join in a lease to a mining company, and at the same time appoint a trustee to collect and distribute the royalties among the respective owners, and for eighteen years such owners acquiesce in a scheme of distribution, fully explained to them by the trustee, and accept payments thereunder, they will be estopped from objecting to the account of the trustee based on such scheme of distribution and from demanding a different plan of distribution by which the shares of the different parties will be affected to the disadvantage of some of them.

4. Where a coal lease is executed, prior to the Act of June 2, 1891, P. L. 182, by several contiguous owners of coal lands, to a common lessee to be operated as a whole, the owners who furnish the barrier pillars required by the act to be left, should be com-

pensated for the necessary support furnished to the others, with-
out which mining operations would not have been possible.

*Contract—Construction—Ambiguity—Interpretation by parties.*

5. It is only where ambiguity in a contract exists that resort
will be had to the actual interpretation placed on the words by the
parties to determine the real understanding.

Argued April 9, 1923. Appeal, No. 216, Jan. T., 1923,
by Gertrude T. Shoemaker, Administratrix of estate of
W. H. Shoemaker, deceased, from decree of C. P. Lu-
zerne Co., Dec. T., 1919, No. 1093, dismissing exceptions
to adjudication of account of Jacob L. Shoemaker, Trus-
tee. Before FRAZER, WALLING, SIMPSON, KEPHART and
SADLER, JJ. Reversed.

Exceptions to adjudication by STRAUSS, J., of account
of Jacob L. Shoemaker, trustee.

The opinion of the Supreme Court states the facts.

Exceptions dismissed in opinion by FULLER, P. J.
Gertrude T. Shoemaker, administratrix of W. H. Shoe-
maker, deceased, appealed.

*Error assigned,* inter alia, was decree, quoting record.

*John P. Kelly,* with him *J. Q. Creveling* and *Joseph P.
Flanagan,* for appellant.—After twenty years of contin-
uous distribution by the trustee under a method unob-
jected to, the court cannot set aside the distribution to
the prejudice of the trustee, or of a distributee: Foll-
mer's App., 37 Pa. 121; McKeever v. Coal Co., 219 Pa.
234; Drake v. Lacoe, 157 Pa. 17; Lancaster v. Flowers,
208 Pa. 199; Lehigh Val. Coal Co. v. Searle, 248 Pa.
385; Bidwell v. Pittsburgh, 85 Pa. 412; Gillespie v.
Iseman, 210 Pa. 1.

*Edwin Shortz, Jr.,* and *A. C. Campbell,* with them
*George R. McLean,* for appellees.—The interpretation of
the lease as set forth by the court in connection with the
decree nisi is correct, and follows the intention of the
parties.

The trustee represents all the cestuis que trust. They
do not deal at arms length as strangers. Neither appel-

lant nor any of the other parties have been misled, or deceived, or injured; there can consequently be no estoppel: Diller v. Brubaker, 52 Pa. 498; Lehigh Val. Coal Co. v. Searle, 248 Pa. 385; Hill v. Epley, 31 Pa. 331; Tustin v. Coal & Iron Co., 250 Pa. 425.

OPINION BY MR. JUSTICE SADLER, May 7, 1923:

The owners of adjoining land, underlaid with coal, leased it, in 1876, for purposes of mining, and, at the same time, executed a deed of trust to one Shoemaker, who was named as manager for all, and given power to relet when necessary. Four years later, a number of other contiguous holders of property joined in this agreement. The first lease was forfeited in 1888, and a new contract entered into, the rights of the grantees therein being subsequently acquired by the Mt. Lookout Coal Company, which has since conducted the operations. Provision was made for the payment of specified royalties, and for distribution by the trustee amongst the lessors "on the basis that each of the said parties [should] furnish a quantity of merchantable coal equal to his area of coal as hereinbefore specified until an ascertainment of the actual quantity furnished by him, her, or them is made as herein provided." The purpose of the arrangement was to have all of the land mined as an entirety, which could be more advantageously done, and to secure to each owner his proper return, every one to be ultimately compensated for the "actual quantity of merchantable coal furnished to the whole."

Until 1895, the distribution of rents was made on the basis of the acreage respectively possessed. Then an estimate of the coal under each tract was completed, and the subsequent method of proportionate division was thus determined. Later, in 1901, the engineer of the mining company reported that one of the veins had become practically exhausted, and the trustee declined to pay further according to calculated tonnage, fearing a final settlement would disclose discrepancies, show er-

rors in disbursements, and personal liability for mistakes made. He then notified all interested, in part, as follows: "I deem it advisable and really imperative to discontinue the payment of royalty on this vein on percentages as formerly, and, in lieu thereof, make payments on a basis of actual mining, or yield, from each respective holding. As a consequence, some will receive for a time no royalty, some less, while others will receive an increase."

From that time until 1919, all of those entitled to share in the income were paid, on the new plan, at the market price, and no protest or complaint was made by any. The result was the exhaustion of all minable coal under some tracts, for which the surface owners were satisfied in full, while others received, during the same period, much less than a proportionate share, in view of their estimated holdings. The trustee, in that year, filed an account in the court of common pleas,—subsequently carried down to April 1, 1920,—and, on the distribution, the respective rights of the property holders were brought to the attention of that tribunal.

A number of questions were raised, but, so far as this appeal is concerned, only two require consideration. It was held by the auditing judge,—certain slight modifications were later made by the court in banc,—that the agreements, having for their purpose the operation of all the land in one body, contemplated the payment to each owner of a proportionate part of all earnings at any time received, while the trust was in force. As a consequence, the entire collections during the period to the date of accounting were added, and a distribution ordered on the basis of estimated underlying tonnage. Credits, by reason of previous payments, were directed to be given, and, when it appeared more had been advanced than the owner was then entitled to, interest was charged on the excess at three per cent to equalize. The scheme of division, followed for eighteen years, was held not to be controlling, though, in the meantime, some of the land

had been worked to exhaustion, and the owners paid in full for their coal, to the disadvantage of the others interested, who, at the time, received no return. Otherwise, it was held, the present appellant, whose coal was later mined, would receive a larger sum than those previously compensated,—the price of the product, and consequently the royalty, having considerably increased.

The correctness of the conclusion reached depends upon the interpretation of the papers to which reference has been made, and a consideration of the conduct of the parties who had joined in the agreements. When the trusts of 1876 and 1880 were entered into, it was the desire of all that the lands be economically mined, which could best be effected by one general operation, and that each person should be paid for the coal which he individually owned. In the lease, a method of fixing the respective portions of rent received was set forth, which was continued in force until 1901, when the possibility of over- or under-payments, on final adjustments, became apparent, and the plan of settlement for each ton taken from a particular tract was acquiesced in. We are not prepared to say there was such ambiguity in the contract of 1888, as to make necessary proof of its meaning, by considering the actual interpretation placed on the words used by those in interest. And it is only where doubt exists that resort will be had to this class of evidence to determine the real understanding: Blough v. Lochrie, 275 Pa. 491; Bittner v. Quemahoning Coal Co., 271 Pa. 579; Lehigh V. Coal Co. v. Searle, 248 Pa. 385. If the words used were of doubtful import, the rule declared in McKeever v. Westmoreland Coal Co., 219 Pa. 234, and like authorities, would be applied, and the construction accepted by the parties for eighteen years held controlling.

There is, however, another aspect of the case, and the evidence referred to becomes most important in its determination. The trustee advised all parties of the intended change, and that all would be paid thereafter as

coal was mined under their several lots, and this was done, at the market price, without any objection for a long period of time. Some owners received prompt return for all they owned, while others were denied any. The lessors, with knowledge of the facts, permitted the substituted plan to be carried out, though it increased the present benefit to some at the expense of others, and ended in payment to a few for all the remaining coal owned, at the current rates, thus effecting, as far as they were concerned, the apparent purpose sought to be realized when the trust agreement was made. It would be inequitable to now permit a collection of a larger amount, based on the value of the unmined coal of others. If the price had fallen, instead of increasing, no recovery, in relief of those still owning, could have been had, the plan of payment having been in force with the consent of all, and those satisfied in full, or in part, should not be permitted now to repudiate the understanding.

"Where a person, with actual or constructive knowledge of the facts, induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. And this is so regardless of the particular intent of the party whose acquiescence induces action": 21 C. J. 1216. "But it seems that the acquiescence need not involve anything in the nature of a positive affirmation, as the rule is well recognized that when a party, with full knowledge, or with sufficient notice or means of knowledge, of his rights and all the material facts, remains inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable": 10 R. C. L. 694. If one, knowing his rights, sees the other acting

on a mistaken notion as to his, an estoppel may arise: P. & R. C. & I. Co. v. Schmidt, 254 Pa. 351; Lancaster v. Flowers, 208 Pa. 199, and authorities there cited. In the present case, those receiving full, as opposed to proportionate, payment, were given an advantage, at the expense of their co-owners, and have had the use of the funds in the meantime. The parties who have coal unmined should not be compelled to pay a part of the value of that now taken from their properties to the lessors already satisfied in the way provided in 1901, and, thereafter, tacitly adopted by all. The conclusion reached by the court below cannot be sustained, and a new distribution must be made in accordance with the views herein set forth.

The third assignment of error complains of any allowance where land was occupied by "barrier pillars" and remains unmined. When the lease of 1888 was entered into, no law required them to be left, but the Act of June 2, 1891, P. L. 182, so provided. The lessors of land, where these supports, composed of merchantable coal, are found, were awarded distribution from the fund in the trustee's hands, since it could not be taken out, but necessarily was continued in place. This resulted in benefit to all the remaining lessors. Appellant insists error was committed in so ordering, as the coal there held will revert to the respective parties on the expiration of the lease. In view of the fact that the property was to be operated as a whole, for the benefit of all, it would be unjust to deny recompense to those furnishing necessary support for the others, making possible any mining operations. Their claims were properly included in the awards.

The decree is reversed, and it is ordered that the record be remitted to the court below for further consideration in accordance with the views expressed in this opinion; costs of this appeal to be paid from the fund for distribution.