**GAF CORPORATION**

v.

**AMCHEM PRODUCTS, INC.**

**Civ. A. No. 72–1994.**

United States District Court,
E. D. Pennsylvania.

Sept. 9, 1975.

K. Robert Conrad, Philadelphia, Pa., for plaintiff.

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for defendant.

1. *Church v. Bobbs-Merrill Company*, 170 F. Supp. 32 (S.D.Ind.), aff'd, 272 F.2d 212 (7th Cir. 1959); *Robbins v. Esso Shipping Company*, 190 F.Supp. 880 (S.D.N.Y.1960); 6 Moore's Federal Practice ¶ 56.17[21] p. 2546 (1974).

## OPINION

Luongo, District Judge.

Plaintiff, GAF Corporation (GAF), a Delaware corporation, filed suit against Amchem Products, Inc. (Amchem), a Pennsylvania corporation, seeking to obtain rights to certain foreign patents controlled by Amchem covering a plant growth regulating acid. Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332. Amchem has moved for summary judgment, pursuant to Rule 56(b), F.R.C.P., contending that the equitable doctrines of estoppel and laches bar GAF's claim for relief.

Affirmative defenses such as estoppel,[1] and laches,[2] may be resolved in a motion for summary judgment. Summary judgment, of course, may not be granted "if there be an issue presented as to existence of any material fact; and all doubts as to existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment." *First Pa. B. & T. Co. v. United States Life Ins. Co.*, 421 F.2d 959, 962 (3d Cir. 1969).

Although there are several factual issues in dispute in this case, none are "material," for even if all disputed facts are resolved in plaintiff's favor, Amchem is still entitled to judgment, accordingly I will grant its motion. In the recitation of the facts of this case, therefore, whenever the parties are in disagreement, the facts will be resolved, and all inferences will be drawn, in plaintiff's favor.

## BACKGROUND

GAF is engaged in the manufacture and sale of chemicals on a worldwide basis. As part of its research and develop-

2. *Dixon v. American Telephone & Telegraph Co.*, 159 F.2d 863 (2d Cir.), cert. denied, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 350 (1947); *George v. Hillman Transportation Company*, 340 F.Supp. 296 (W.D.Pa.1972); *Walker v. McCollough*, 257 F.Supp. 560 (E.D.Pa.1966); 6 Moore's Federal Practice ¶ 56.17[38] p. 2575-7 (1974).

ment program, GAF employees synthesize and evaluate chemicals of potential commercial use in industry and agriculture. To test agricultural chemicals, nursery and greenhouse facilities are required. In the period relevant to this suit, GAF did not maintain agricultural test facilities of its own but instead engaged outside companies, including Amchem, to test or "screen" these chemicals.

A. *The Screening Agreement and its Operation*

In 1961, Amchem agreed to test for GAF the effectiveness of certain chemicals as herbicides and/or plant growth regulators. The written screening agreement between the corporations provided inter alia that, from time to time, GAF would offer Amchem groups of chemicals; Amchem would select from each group the chemicals it wished to screen; GAF would send a sample, and disclose in confidence the structure, of each chemical selected; and Amchem would test the chemicals and report to GAF, at least twice annually, those chemicals in which Amchem had a continuing interest. The agreement permitted GAF and Amchem to file patents covering their respective inventions and discoveries.

Amchem placed all chemicals received from GAF into a primary screening program. Chemicals which showed biological activity after primary screening then were placed into secondary screen-

ing for further testing. Dr. Anson R. Cooke (Dr. Cooke), Director of Biological Research for Amchem, participated in the screening program and drafted the semi-annual reports required under it by Amchem.

On March 3, 1965, forty-three chemicals were offered, of which Amchem [3] requested thirty-seven for testing, including 2-chloroethyl phosphonic acid; an ester [4] of the acid; and the acid dichloride. Dr. Cooke's semi-annual report dated August 1, 1965, noted that, as of that date, the ester was undergoing secondary screening as a defoliant and plant growth regulator, while the acid and dichloride were undergoing secondary screening as defoliants.

On January 4, 1966, at a day-long meeting to discuss agricultural chemicals, Dr. Cooke informed GAF personnel present [5] that Amchem remained highly interested in the ester since, in tests already completed, the ester had shown remarkable growth regulating properties. In many crops, a single bud, the terminal bud, grows to maturity. In doing so, it inhibits the growth of other plant buds and accordingly limits crop yields. The ester reversed this process.[6] It inhibited the terminal bud and caused auxiliary bud stimulation in tomato and cotton plants. The possibility that use of the ester could dramatically increase crop yields generated considerable excitement and Dr. Cooke requested an additional ester sample for further testing.

3. The following GAF personnel were directly involved in the screening program: J. P. Copes (Copes) gathered, and prepared a compound sheet describing each chemical to be offered Amchem. These sheets were sent to Dr. M. E. Chiddix (Dr. Chiddix), Program Manager for Organic Chemical Research. Based upon his experience in organic chemical research, Dr. Chiddix would review the chemicals, make corrections, additions or deletions he thought necessary and forward the compound sheets to the GAF Commercial Development Department (CDD) in New York. Philip B. Dalton (Dalton) was Vice President of CDD; Dr. R. L. Mayhew (Dr. Mayhew) was Director of CDD and Dr. Edward O. Leonard (Dr. Leonard) and T. M. Rozycki (Rozycki) worked for Dr. Mayhew.

Rozycki received the compound sheets from Dr. Chiddix, performed specified tasks, and forwarded the sheets to Amchem.

4. An ester is a combination of an "alcohol type" compound with an "acid." In this instance a catechol ester of 2-chloroethyl phosphonic acid (catechol being the name of the particular alcohol used) was provided to Amchem.

5. Included among the GAF personnel were Copes, Rozycki and Drs. Mayhew and Chiddix.

6. Apical dominance is the term used to describe the inhibition of auxiliary buds by the terminal bud. The ester showed promise in controlling apical dominance.

Dr. Cooke also informed the GAF personnel present that Amchem had discontinued testing the acid, the dichloride, and all other chemicals undergoing secondary screening solely as defoliants. Dr. Cooke's semi-annual report dated February 1, 1966, listed the ester, but did not list either the acid or dichloride, as of continuing interest to Amchem.

B. *Dr. Randall's Discovery of the Use of the Acid* [7]

Dr. David T. Randall (Dr. Randall) was a Senior Scientist employed by GAF and as such he was permitted to choose the projects on which he worked. Dr. Randall was interested in agricultural chemicals and GAF assigned him to manufacture additional quantities of, and to synthesize analogs [8] around, the ester. Dr. Randall, who also attended the January 4 meeting, was inventor or co-inventor in many domestic and foreign patents.[9] The GAF patent department worked closely with Dr. Randall on patent applications since, under the terms of his employment agreement, he was required to assign all patentable discoveries to GAF.

Dr. Randall intensively analyzed the chemical structure of the ester compound. In the months following the January 4 meeting, Dr. Randall became convinced that the acid and the acid alone was responsible for the activity shown by the ester. He discussed this theory with Dr. Cooke, but Dr. Cooke rejected it because a sample of the acid had already been tested and found inactive as a plant growth regulator. Unable to refute the fact of the acid's tested inactivity, Dr. Randall returned to the laboratory. There he reasoned that if the original acid sample provided to Amchem was impure, the acid might still prove responsible for the ester's activity. He tested the first acid sample, found it impure, synthesized a second acid sample and delivered it personally to the Amchem test facilities on March 16, 1966.

Amchem tested the second acid sample. In a GAF-Amchem meeting on May 25, 1966,[10] and in a letter from Dr. Cooke to Dr. Leonard dated May 27, 1966, Dr. Cooke confirmed Dr. Randall's theory by reporting that the acid exhibited plant growth regulating activity equal to the ester in greenhouse tests. Dr. Cooke also noted that the acid was considerably cheaper than the ester to manufacture. The semi-annual report dated August 1, 1966, listed the new acid sample as of continuing interest to Amchem. By September 1966, Amchem decided to commercialize the acid rather than the ester.

Amchem continued secondary screening of the acid throughout the fall of 1966. Amchem decided to neutralize the acid to minimize its corrosive effect on metal spraying tanks and equipment. In the process of neutralizing the acid, however, a gas evolved and the entire mixture bubbled over. Dr. Cooke asked Dr. Randall to find a solution to the neutralization problem. By November 7, 1966, Dr. Randall began to explore this problem by attempting to identify the gas. It was known that ethylene gas possessed remarkable growth regulating properties. Dr. Randall concluded that the activity of the acid could be explained if the acid caused the release of ethylene gas. He isolated the gas produced by the acid, identified it as ethylene and informed Dr. Leon Katz (Dr. Katz), Vice President for Research and

---

7. Dr. Randall's discovery of the acid is controverted by Amchem except for purposes of this motion for summary judgment. The facts and inferences herein recited are resolved in GAF's favor.

8. Isomers are related compounds that have the same molecular formula but different three dimensional structures. Homologs are related compounds that differ from one an-other by identical chemical groupings. Analogs are related compounds that are neither isomers nor homologs.

9. As of the date of his deposition on February 8, 1973, Dr. Randall testified that he had been named as inventor or co-inventor in over 100 domestic patents alone.

10. Present at the meeting were Copes and Drs. Chiddix, Leonard and Mayhew.

Development for GAF, of this discovery. Dr. Katz, in turn, informed Amchem. The discovery that the acid was an ethylene releasing agent intensified the efforts of GAF and Amchem to obtain patent protection for the acid and its related compounds.

C. *GAF and Amchem Patent Activity*

In February and March 1966, attorneys in the GAF patent department as a result of the initial interest shown in the ester, researched the relevant patent law in order to formulate a policy to govern patent applications arising under the screening agreement. Their research disclosed that patents could be filed for novel chemicals, for non-novel chemicals when a new use for the chemical was discovered (use patents), and for new manufacturing processes to produce novel or non-novel chemicals (process patents). GAF's attorneys concluded, therefore, that GAF could file patents on novel chemicals and for new manufacturing processes, but that new uses would ordinarily be discovered, and use patents filed, by the company performing the screening.

This interpretation of the patent law was communicated to GAF chemists, including Dr. Randall. Since the acid and the ester were non-novel compounds, the attorneys in the patent department believed that any new use would be discovered by and be the property of Amchem. Dr. Randall, based upon that GAF policy, also believed that any use patent would be Amchem's property and, although he informed Dr. Katz of the ethylene release from the acid, he failed to inform anyone at GAF of his inventive work with the acid.

Amchem, as early as March 4, 1966, sought use patent protection for the ac-

tivity of the ester which its employees had discovered. Amchem and GAF agreed, however, that no patents would be filed until the ester's active ingredient was discovered. On May 25, 1966, a GAF-Amchem meeting was held to discuss a broad growth regulating patent. By August 12, 1966, Amchem, believing that its employees had also discovered the use of the acid, filed a rough draft of a patent application designed to protect the acid as well as the ester. This draft was reviewed extensively at a GAF-Amchem meeting held September 8, 1966. A final draft of this patent application was mailed by Amchem to the GAF patent department on December 1, 1966. On February 23, 1967, Amchem filed a domestic use patent application covering the acid and related compounds.

The GAF patent department, pursuant to its interpretation of the patent law, investigated only the patentability of novel compounds similar in structure to the acid, and of various processes for manufacturing the acid and the ester. Dr. Randall was assigned to work on the patent applications for the novel compounds. On February 23, 1967, simultaneously with Amchem's filing, GAF filed patent applications for novel compounds related to the acid.

Amchem intensified its efforts to commercialize the acid following the filing of the domestic patent. Dr. Cooke in 1967 investigated the use of the acid to induce flowering in pineapple plants.[11] A second patent, filed by Amchem, covered this use.[12] During 1967, Amchem determined that the potential use for the acid warranted patent filings worldwide. In November 1967, Amchem informed GAF that it was filing foreign patents for all use cases, and on July 12, 1968, it furnished to GAF the applica-

11. An article entitled "2-Haloethanephosphonic Acids as Ethylene Releasing Agents for the Induction of Flowering in Pineapples" published in *Nature*, a prestigious British magazine, on June 8, 1968, resulted from the continuing research on the acid. The article, co-authored by Drs.

Cooke and Randall, described the ability of the acid to release ethylene gas to induce flowering in pineapples.

12. Amchem eventually filed a series of five patents to protect the use of the acid.

tion and filing dates for these patents.[13] In October 1969, Dr. Cooke was added as a co-inventor of the initial use patent.

D. *GAF's Discovery of Dr. Randall's Work*

On May 11, 1970, Walter Kehm (Kehm) was named GAF's Director of Patents, Licenses and Trademarks. Dalton, now an Executive Vice President of GAF, asked Kehm to investigate GAF's patent position respecting the acid. Kehm studied GAF patent policy from 1966–70 and personally interviewed Randall and Copes. Kehm determined that the patent department had erred in its conclusion that only a screener could discover a new use of a known compound Kehm concluded that it was Dr. Randall, aided by Copes, who had discovered the use of the acid, but that because of GAF's patent policy, no one at GAF had known of the discovery. Kehm, in a memorandum dated December 21, 1970, informed Dalton that Dr. Randall had discovered the use and that GAF was the legal owner of the patents controlled by Amchem.

Acting upon this information, Dalton met with Eugene A. Snyder (Snyder), President of Amchem, on January 22, 1971, and presented GAF's claims to the patents. By the end of 1970, Amchem had invested over $3,500,000 on research and development, patent filings, international and domestic marketing and sales, and manufacturing and engineering costs related to the acid. Snyder refused to acknowledge GAF's claim.[14] In 1971 and 1972, Amchem spent an additional $4,000,000 related to commercialization of the acid. On October 11, 1972, GAF filed the present suit seek-

13. The July 12, 1968, letter listed the status of the foreign filings as follows:

| Country | Application Number | Application Date | Patent No. and Remarks |
|---|---|---|---|
| Argentina | 211,480 | 12/15/67 | 164,735 |
| Australia | 30,179 | 11/22/67 | Pending |
| Austria | A 1750/68 | 2/23/68 | Pending |
| Belgium | 54/964 | 2/23/68 | 711,222 |
| Brazil | 195,630 | 12/18/67 | Pending |
| Canada | 000,279 | 9/16/67 | 803,947 |
| Chile | 120/68 | 1/31/68 | 22,993 |
| Colombia | 107/748 | 1/25/68 | Pending |
| Denmark | 717/68 | 2/23/68 | Pending |
| England | 08859/68 | 2/23/68 | 1,194,433 |
| France | 141,126 | 2/23/68 | 1,155,173 |
| Germany | A 58,241 | 2/20/68 | Pending |
| Holland | 68/02,633 | 2/23/68 | Pending |
| India | 114,697 | 2/23/68 | 114,697 |
| Israel | 29,492 | 2/18/68 | Pending |
| Italy | 50,620–A/68 | 2/22/68 | 826,945 |
| Japan | 11354/1968 | 2/22/68 | Pending |
| | 37332/1968 | 5/31/68 | Pending |
| | 39187/1968 | 6/ 7/68 | Pending |
| Mexico | 100,046 | 12/ 5/68 | 101,871 |
| New Zealand | 150,774 | 11/21/67 | Pending |
| | 161,627 | 2/22/68 | Pending |
| South Africa | 67/6974 | 11/20/67 | Abandoned |
| | 68/1036 | 2/16/68 | Granted 6/4/69 |
| Spain | 350,866 | 2/23/68 | Pending |
| Sweden | 2389/68 | 2/23/68 | Pending |
| Switzerland | 2615/68 | 2/23/68 | Pending |
| Venezuela | 1874/67 | 11/30/67 | Granted |
| | 767/68 | 5/ 7/68 | Granted |

14. For purposes of this motion, Amchem admits that Snyder did not act in good faith in so refusing.

ing, with respect to foreign patents or patent applications based upon GAF inventions, to have Amchem (a) declared constructive trustee for the benefit of GAF; (b) enjoined from bringing suit thereon; (c) enjoined from assigning, licensing or otherwise encumbering them; (d) enjoined from amending, abandoning or taking any other action thereon; (e) assign to GAF all rights thereto; and (f) account for profits thereon. GAF also asked that it be awarded costs of the action and any other relief the court deemed just and proper.

## DISCUSSION

GAF seeks recognition of Dr. Randall's discovery of the use of the acid and asks this court, sitting in equity, to relieve GAF of a series of mistakes which resulted in its failure to discover Dr. Randall's inventive contributions until 1970. In these proceedings, GAF seeks only to obtain rights in foreign patents and patent applications now controlled by Amchem.[15] Amchem contends that if any mistakes were made by GAF, they were the result of GAF's own actions and omissions and that GAF's claim for relief is barred by estoppel and laches.

### A. *Mistake*

GAF seeks relief from a combination of mistakes. The first mistake was committed by the attorneys in the GAF patent department when they concluded that only a screener could discover a new use of a non-novel compound. This resulted in a GAF patent inquiry limited to novel chemical and process patents, and also caused Dr. Randall's silence concerning his inventive contributions. The initial mistake led to GAF's second mistake, i. e., its belief that Amchem had discovered the use of the acid. GAF contends that Amchem made the same mistake.

■■ The parties agree that Pennsylvania law governs this dispute. A mistake of law has been defined in Pennsylvania as a mistake as to the legal consequences of an assumed state of facts. A mistake of fact has been defined as any mistake except a mistake of law. *Betta v. Smith*, 368 Pa. 33, 36, 81 A.2d 538 (1951). Under these definitions, the erroneous belief of GAF's patent attorneys that only a screener could discover a new use appears quite clearly to be a mistake of law.

■ GAF contends that Pennsylvania courts will relieve from a mistake of law in circumstances similar to the present case and cites *First National Bank v. Rockefeller*, 333 Pa. 553, 5 A.2d 205 (1939), in support of this proposition. In *Rockefeller*, a bank which held two mortgages on a property purchased the property at a public sale. The executrix who ordered the sale had mistakenly notified the interested parties that the property would be sold subject only to the mortgages. The bank, believing that all liens subsequent to the mortgages were discharged by the sale, satisfied its mortgages. The subsequent liens were not discharged by the sale. The Pennsylvania Supreme Court struck the satisfactions and reinstated the mortgages, thus relieving the bank of the error.

The court's opinion restated "the time honored rule" that "ignorance or mistake of law with full knowledge of the facts, is not per se a ground for equitable relief . . . . [This rule] has been approved and followed in numerous decisions of this Court. Among them may be cited *Good v. Herr*, 7 W.&S. 253; *Clapp v. Hoffman*, 159 Pa. 531, 28 A. 362; *Norris v. Crowe*, 206 Pa. 438, 55 A. 1125; *Mulholland's Estate*, 224 Pa. 536, 73 A. 932; *Pa. Stave Co.'s Appeal*, 225 Pa. 178, 73 A. 1107; *Clark v. Lehigh & W.-B Coal Co.*, 250 Pa. 304, 95 A. 462; *Shields v. Hitchman*, 251 Pa. 455, 96 A. 1039." *Rockefeller, supra* at 557, 5 A.2d at 206. The court, quoting *Clark v. Lehigh & W.-B. Coal Co.*, 250 Pa. 304, 312, 95 A. 462 (1915), stated,

15. GAF is attaching Amchem's domestic rights in another forum.

333 Pa. at p. 559, 5 A.2d at p. 207, that if mistakes of law ordinarily were relieved by the courts "there could be no security in legal rights, no certainty in judicial investigations, no finality in litigations." The court, finding that the actions of the parties resulted from a mutual mistake of law, that the executrix had not changed position after the sale, and that gross hardship to the bank and unjust enrichment to the estate would result unless the mistake was relieved, created an exception to the general rule limited to those specific facts.

The present case is clearly distinguishable from *Rockefeller*. While it can be said that GAF will suffer hardship, and that Amchem will be enriched as a result of the mistake, GAF has not claimed, and indeed cannot claim, that there was a mutual mistake of law. GAF alone made the erroneous interpretation of patent law. Further, Amchem has clearly changed its position and would be prejudiced if GAF were now relieved of the consequences of its mistake. See Discussion, infra p. 658.

The instant factual circumstances more nearly resemble those of another case cited by GAF, *Sanner v. Unique Lodge No. 3, K. of P.*, 152 Pa.Super. 639, 33 A.2d 518 (1943). In *Sanner*, two creditors held liens on a parcel of real estate sold by the county. After the sale, one lien creditor (appellant) permitted his lien to expire and two years later attempted to redeem the property. Appellant mistakenly believed that, even though his lien had expired, he was permitted to redeem the property under Pennsylvania law and thereby gain priority over other creditors. The court held appellant was not entitled to priority for the money he spent in redeeming the property since he alone had made a mistake of law. As in *Sanner*, GAF has made a unilateral mistake of law which may not be relieved in Pennsylvania.

Pennsylvania courts have, however, relieved for a mistake of law when one party has acted in bad faith. *Lancaster v. Flowers*, 208 Pa. 199, 57 A. 526 (1904). GAF contends that bad faith has been established here (at least for purposes of this motion) by Amchem's refusal to consider the GAF claim to patent ownership in 1971. *Lancaster* and other cases (see e. g., *Clark v. Lehigh & W.–B. Coal Co.*, supra 250 Pa. at 313, 95 A. 462 and *Wilson v. Ott*, 173 Pa. 253, 34 A. 23 (1896)) have all required that there be a mutual mistake of law before applying the inequitable conduct exception. Even assuming, arguendo, a mutual mistake of law, GAF has cited no case, and I have found none, supporting the proposition that bad faith in one time period may retroactively taint a party's conduct occurring years earlier. Whatever bad faith Amchem may have been guilty of in 1971 cannot taint its otherwise innocent conduct in 1966.

GAF alternatively contends that its combination of mistakes should be treated either as a pure mistake of fact shared by GAF and Amchem or as a "mixed" mistake of law and fact. Pennsylvania courts will not grant relief from a unilateral mistake but will relieve for mutual mistakes of fact. *Smith v. Capital Bank & Trust Co.*, 325 Pa. 369, 191 A. 124 (1937); *Radnor B. & L. Assn. v. Scott*, 277 Pa. 56, 120 A. 804 (1923). Pennsylvania courts will also relieve parties of the consequences of a "mixed" mistake but these courts require that the "mixed" mistake include a mutual mistake of fact before granting relief. See *Russell's Appeal*, 75 Pa. 269 (1874); and *Gross v. Leber*, 47 Pa. 520 (1864). Assuming that the combination of mistakes should be considered either a mistake of fact, or a "mixed" mistake, there was no mutual mistake of fact for GAF was at least on inquiry notice and, in addition, had constructive knowledge of Dr. Randall's discoveries.

A corporation can acquire knowledge of facts only through its officers and agents, *A. Schulman, Inc. v. Baer Co., Inc.*, 197 Pa.Super. 429, 178 A. 2d 794 (1962), and in Pennsylvania, knowledge of a corporate president, *Schulman, supra,* or vice president, *Corn*

*Exchange National Bank & Trust Co. v. Burkhart*, 401 Pa. 535, 165 A.2d 612 (1960), is considered knowledge of the corporation. A corporate officer or other high ranking official can acquire knowledge of facts only after direct inquiry of or disclosure by other corporate agents. Legal principles in Pennsylvania have been adopted to recognize this corporate "fact of life." It has been held that *notice* of a fact is *knowledge* of that fact, *Bridgewater Borough v. Pa. PUC*, 181 Pa.Super. 84, 123 A.2d 266 (1956), and that "[t]he general rule of Pennsylvania is that whatever is sufficient to put a party on inquiry amounts to notice, provided that the inquiry becomes a duty . . . and would lead to knowledge of the requisite facts by the exercise of ordinary diligence and prudence." *In Re Leader Furniture Co.*, 36 F.Supp. 986 (E.D.Pa.1939). See also *First Nat. Bank v. Pittsburgh F. W. & C. Ry. Co.*, 31 F.Supp. 381 (E.D.Pa. 1939); *Pa. Range Boiler Co. v. Phila.*, 344 Pa. 34, 23 A.2d 723 (1942). It has also been held that if a corporate agent has notice of a fact even if he failed to disclose it, notice to the agent is notice to the corporation whenever "it is the duty of such agent to act upon the notice or to communicate it . . . ." *A. Schulman, Inc. v. Baer Co., Inc.*, *supra* 197 Pa.Super. at 434, 178 A.2d at 796. Absent these principles of inquiry notice and constructive knowledge, corporate officers and officials could deny knowledge or notice of relevant facts and thereby shield their corporation from any attendant liability.

Dr. Randall, as a Senior Scientist in the employ of GAF, was clearly an agent of the corporation. From the facts earlier stated, GAF, in 1966, knew that Amchem was interested in the ester and that it had discontinued testing the acid; that Dr. Randall was assigned to synthesize additional growth regulating chemicals; that Dr. Randall synthesized and delivered a second acid sample to Amchem and that Amchem tested the new sample and found it equal in activity to the ester in greenhouse tests. In 1966 Dr. Katz, Vice President for Research and Development of GAF, knew and therefore GAF knew that Dr. Randall had discovered that ethylene was released by the acid. In 1968, GAF knew that Dr. Randall was named co-author of an article describing the ethylene release process (see footnote 11 supra). From these facts, as a matter of law, GAF officers, including Dr. Katz, were under a duty to inquire as early as 1966, and most certainly not later than the time of the 1968 publication of the *Nature* article. Inquiry of Dr. Randall in either time period would have disclosed his discovery of the use of the acid. Since GAF, through its officers, was on inquiry notice, it is chargeable with knowledge of all facts which it could have learned by the exercise of reasonable diligence.[16]

---

16. GAF contends that even if a party was negligent in failing to discover a fact as to which both parties were under a mistake, the party is still entitled to relief under Pennsylvania law. GAF cites the following series of cases in support of this proposition: *McKibben v. Doyle*, 173 Pa. 579, 34 A. 455 (1896); *Kunkel v. Kunkel*, 267 Pa. 163, 110 A. 73 (1920); *Smith v. Capital Bank & Trust Co.*, 325 Pa. 369, 191 A. 124 (1937); *Betta v. Smith*, 368 Pa. 33, 81 A.2d 538 (1951); and *Klerlein v. Fred Werner Co., Inc.*, 98 Pa.Super. 440 (1929). McKibben, Kunkel and Smith were all cases in which one party paid money to another under a mutual mistake of fact. The court in McKibben stated that, 173 Pa. at 581, 34 A. at 455: "The mere omission to take advantage of means of knowledge within the reach of the party does not prevent a recovery."

Kunkel, Smith and Betta cite McKibben for this principle while relieving a party from the consequences of a mutual mistake caused by the negligent failure of a party to discover the relevant facts.

A close reading of McKibben, however, discloses that the court also held that a party under *inquiry notice* would not be relieved of a negligent failure to discover the relevant facts. The court quoting *Meredith v. Haines*, 14 W.N.C. 364 stated: "It is not sufficient to prevent a party from recovering money paid by him under a mistake of fact that he had the means of knowledge of the facts unless he paid it intentionally, *not choosing to investigate the facts*." (Emphasis added) In Klerlein, an investigation was made but it failed to disclose the relevant facts. In this circumstance, the court relieved a mutual mistake of fact.

■ ■ Additionally, GAF had constructive knowledge of Dr. Randall's discovery. GAF insists that although Dr. Randall disclosed to Dr. Katz that ethylene was released, he failed to disclose to Dr. Katz or to anyone else in authority at GAF his discovery of the *use* of the acid. Although it is almost inconceivable that a man as patent-wise as Dr. Randall would fail to disclose all of his inventive work, I must, and do, for purposes of this summary judgment motion, assume that he did not. Nevertheless, it is clear from the record that Dr. Randall was under a continuing duty to communicate to appropriate officials of GAF all facts which might lead to the filing of patents, notwithstanding that his employer's patent policy might have precluded it from pursuing the matter. Dr. Randall's knowledge under these circumstances is imputed to GAF.

B. *Estoppel*

Since I have concluded that GAF, as a matter of law, was on inquiry notice, and had constructive knowledge of all relevant facts in 1966, I will now consider Amchem's contention that GAF's claims are barred by estoppel and laches.

■ Equitable estoppel is the resultant of conduct by one party which precludes him from asserting rights against a second party who relied upon the first party's conduct and prejudicially changed his position. 3 Pomeroy Equity Jurisprudence § 804, pp. 188–189 (1941). In Pennsylvania, estoppel requires an interplay of conduct by the party sought to be estopped and the party seeking the estoppel. As to the party sought to be estopped, Pennsylvania law requires:

(1) that the one party by "acts, representations, or admissions, or by his silence when he ought to speak out", *Northwestern Nat. Bank v. Commonwealth*, 345 Pa. 192, 196–7, 27 A.2d 20, 23 (1942), citing 31 C.J.S. Estates § 59 p. 237, and cited in *Tallarico Estate*, 425 Pa. 280, 288, 228 A.2d 736 (1967), induces another to believe certain facts exist;

(2) that the party making the representations expects them to be acted upon by the other party, *Watt Estate*, 409 Pa. 44, 185 A.2d 781 (1962); and

(3) that the party making the representation possessed actual or constructive knowledge, *Shoemaker's Account*, 277 Pa. 424, 121 A. 510 (1923), or was culpably negligent in failing to discover the true facts. *Northwestern National Bank, supra* at 196, 27 A.2d 20.

■ As to the party seeking the estoppel, Pennsylvania law requires " '(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) actions based thereon of such a character as to change his position prejudicially': 19 Am.Jur., Estoppel, § 42 pp. 642, 643." *Watt Estate, supra* 409 Pa. at 65–6, 185 A.2d at 792.

■ By its silence, GAF induced Amchem to believe that the latter's employees had discovered the use of the acid. GAF was certainly aware that Amchem would act upon that belief. Further, as discussed above, GAF had constructive knowledge of Dr. Randall's discovery of the use of the acid.[17] GAF,

While special treatment may be afforded a party who pays money under a mutual mistake of fact, no money was so paid in this case and, as noted above, GAF was under inquiry notice of Dr. Randall's discovery. More importantly, the prevailing view in Pennsylvania is that a party will not be relieved of the consequences of a mutual mistake of fact caused by his own negligence. As recently restated by the Pennsylvania Supreme Court in *First Federal S. & L. Assn. v. Swift*, 457 Pa. 206, 213, 321 A.2d 895 (1974), quoting *Home Owners' Loan*

*Corp. v. Crouse*, 151 Pa.Super. 259, 30 A. 2d 330 (1943): "[C]ourts of equity will not relieve a party from the consequences of an error due to his own ignorance or carelessness when there were available means which would have enabled him to avoid the mistakes if reasonable care had been exercised."

17. Since GAF had constructive knowledge, it is unnecessary to determine whether GAF was culpably negligent in failing to acquire actual knowledge of Dr. Randall's discovery.

therefore, fits all of the requirements of conduct on the part of the party sought to be estopped.

Amchem, the party seeking the estoppel, clearly acted in reliance on GAF's silence when it applied for patents to protect the acid and expended money in its development, but GAF contends that Amchem cannot satisfy the remaining two of the elements required for estoppel. It argues that (1) Amchem had the same means of knowledge as GAF and (2) Amchem suffered no prejudice from GAF's silence.

GAF acknowledges that Amchem had no actual knowledge of Dr. Randall's discovery until 1971, but it insists that because of the close working relationship between the companies, Amchem had equal means of ascertaining the true facts. I cannot agree. Even though the corporations were working closely, GAF and Amchem were nevertheless separate entities and there is nothing in this record to suggest any relationship between Dr. Randall and Amchem comparable to that which existed between Dr. Randall and GAF. As noted above, Dr. Randall's employment agreement put him under a duty to disclose to his employer all patentable discoveries, including his discovery of the use of the acid. GAF's whole case revolves around its contention that Dr. Randall had told *no one* of his discovery of the use. While he was under a duty to disclose it to GAF, he was under no duty to disclose it to Amchem.

GAF also argues that Amchem suffered no prejudice from the four year delay between the date of initial patent filing and the date GAF informed Amchem of its claims. The record is to the contrary. Pennsylvania cases have held that prejudice is shown when a party has taken the risk of success or failure of an enterprise. *Siegel v. Engstrom,* 427 Pa. 381, 235 A.2d 365 (1967); *Dohnert's Appeal,* 64 Pa. 311 (1870), and see *Martin v. Adams Co. A. V. Tech. S. Auth.,* 11 Pa.Cmwlth. 292, 313 A.2d 785 (1973). The principal was stated clear-

ly in a Tenth Circuit case, *Pfister v. Cow Gulch Oil Co.,* 189 F.2d 311, 315 (10 Cir. 1951):

"A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risk of the enterprise. The injustice of permitting one, holding the right to assert an interest in property of a speculative character, to voluntarily await the event and then decide, when the danger is over and the risk has been that of another, to come in and share the profit, is obvious."

In *Siegel,* plaintiff sought to enjoin defendant's oil and gas drilling operations. In 1962, plaintiff was granted a two year lease to drill on defendant's land provided that operations either commenced within three months from the date of the lease or plaintiff pay a dollar per acre for each month of delay. Plaintiff failed to commence drilling within the specified period but paid the money called for in the event of delay. In 1963 defendants refused the payments which plaintiff tendered, stating in a letter to plaintiff that they considered the lease terminated. Two months later, defendants entered into a second lease for the same premises. Plaintiff became aware of the second lease in 1963 but remained silent until 1965. The court denied plaintiff's request for injunctive relief, holding that defendant had been prejudiced by the "gamble of drilling" during the period between 1963 and 1965.

While the "risk of the enterprise" doctrine has been mostly applied in considering prejudice where the defense of laches has been asserted, its applicability in testing whether there has been prejudice for estoppel purposes in this case is apparent. In 1966, both corporations were aware that use patents could be filed for the acid, but it was by no means certain that the acid would prove com-

mercially successful. Between 1965 and 1970, Amchem spent over $3,500,000 developing the acid, making it commercially successful, and seeking and obtaining patent rights for the acid. During this four year period, Amchem clearly assumed the "risk of the investment" and GAF is therefore estopped to deny Amchem's ownership of the fruits of its gamble.

### C. *Laches*

 The purpose of the equitable doctrine of laches "is for the repose of title, claims and demands for peace and order in society." *Gabster v. Mesaros,* 422 Pa. 116, 119, 220 A.2d 639, 641 (1966). The Pennsylvania Supreme Court in *Wilson v. King of Prussia Enterprises, Inc.,* 422 Pa. 128, 133, 221 A. 2d 123, 126 (1966) stated:

"The application of the equitable doctrine of laches does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice. See, *Brodt v. Brown,* 404 Pa. 391, 172 A.2d 152 (1961), and *Lutherland, Inc. v. Dahlen,* 357 Pa. 143, 53 A.2d 143 (1947)."

 In laches, as in estoppel, "[t]he question in any given case is not what did a party know . . . but what he might have known, by use of means of information within his reach, with the vigilance the law requires of him?" *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.,* 167 Pa. 136, 152, 31 A. 484, 485 (1895); cited in *Barnes & Tucker Co. v. Bird Coal Co.,* 334 Pa. 324, 333, 5 A.2d 146 (1939); see also *Patton v. Commonwealth Trust Co., Executor, et al,* 276 Pa. 95, 119 A. 834 (1932); *Taylor v. Coggins,* 244 Pa. 228, 90 A. 633 (1914). As noted above, GAF was on inquiry notice and had constructive knowledge of the relevant facts in 1966, yet waited until 1971 to inform Amchem

of its claims, and until October 1972 to institute suit. Amchem was prejudiced between 1966 and 1970 because it assumed the risk of the enterprise.

 Pennsylvania courts have barred suits for laches when the delay in commencement of the suit was four months, *Turtzo v. Boyer,* 370 Pa. 526, 88 A.2d 884 (1952); one year, *Wilson v. King of Prussia Enterprises, Inc., supra* 422 Pa. at 132, 221 A.2d 123; and 1½ years, *Siegel v. Engstrom, supra* 427 Pa. at 386, 235 A.2d 365. Here the delay was almost four years until Amchem was informed of the GAF claims and almost six years until the suit was actually initiated. GAF seeks to counter Amchem's laches defense by pointing to Amchem's own delay until 1969 in adding Dr. Cooke as a co-inventor of the patent which it had filed in 1967. The relevance of this argument escapes me. The delay in adding another of Amchem's employees as a co-inventor of an Amchem owned patent cannot be equated to the delay in asserting an "adversary" claim of inventorship by an employee of GAF. Amchem's delay cannot serve to defeat its assertion of the defense of laches for GAF's delay.

 GAF finally contends that while laches may bar an accounting for past profits, it will not bar prospective relief. GAF cites *Consolidated Home Specialties Co. v. Plotkin,* 358 Pa. 14, 55 A.2d 404 (1947), quoting *Klepser v. Furry,* 289 Pa. 152, 159, 137 A. 175, 177 (1927), for the proposition that "[i]n suits for unfair competition or infringement it is well settled that mere laches in the sense of delay to bring suit does not constitute a defense. Such laches may bar an accounting for past profits, but will not bar an injunction against a further continuance of the wrong." The court in *Klepser* cited the United States Supreme Court case of *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888), and derived the above quoted proposition from existing federal law. The proposition, however, is applicable only when there has been "mere laches,"

meaning either delay without attendant prejudice, see *Carl Zeiss Stiftung v. Veb Carl Zeiss Jena,* 433 F.2d 686, 704 (2nd Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), cited in *Coca-Cola Company v. Howard Johnson Company,* 386 F.Supp. 330 (N.D.Ga. 1974), or delay without attendant prejudice sufficient to create an estoppel. See *Holiday Inns, Inc. v. Holiday Inn,* 364 F.Supp. 755 (D.S.C.1973). Here Amchem was prejudiced by the delay and, as found earlier, the elements of estoppel exist. Thus, even if GAF has asserted a claim of unfair competition,[18] that claim is likewise barred, *in toto,* by laches.

Amchem's motion for summary judgment will be granted.

---

16. GAF claimed *in its brief* that a cause of action has been stated for misappropriation of a trade secret.