GAF CORPORATION, Appellant,

v.

AMCHEM PRODUCTS, INC.

No. 76–2302.

United States Court of Appeals,
Third Circuit.

Argued May 3, 1977.*

Decided Jan. 18, 1978.

* Disposition of this appeal was delayed by the court at the request of the appellant pending settlement negotiations, which have not come to fruition.

K. Robert Conrad, Charles J. Bloom, Katherine K. Dodd, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for GAF Corporation, appellant; Walter C. Kehm, GAF Corp., Wayne, N. J., Robert E. Kosinski, Watson, Leavenworth, Kelton & Taggart, New York City, Alan H. Bernstein, Stanley H. Cohen, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., William D. Breneman, Washington, D. C., Ernest G. Szoke, Amchem Products, Inc., Ambler, Pa., of counsel.

Carl G. Love, Cushman, Darby & Cushman, Jack L. Lahr, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for appellee.

Before GIBBONS and HUNTER, Circuit Judges, and LAYTON,** District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Plaintiff GAF Corporation, a Delaware corporation (GAF), appeals from the grant of summary judgment in favor of Amchem Products, Inc., a Pennsylvania corporation (Amchem). In this diversity action GAF seeks to have a constructive trust declared in its favor over certain foreign patents controlled by Amchem relating to a plant growth regulating acid called 2-chloroethyl phosphonic acid. The theory on which GAF claims that the foreign patents rightfully belong to it is that a GAF employee, Dr. David T. Randall, made the discovery that 2-chloroethyl phosphonic acid would regu-

late plant growth and disclosed the invention to employees of Amchem. Amchem filed a patent application covering use of the acid and related compounds as plant growth regulators in February, 1967.[1] The foreign patents here in issue are derivative of the American filing. The district court did not determine whether Dr. Randall was the inventor. Rather, the court held that, assuming he was the inventor, GAF was barred by estoppel and laches from seeking the imposition of a constructive trust on the invention in the hands of Amchem.[2] We conclude that there were disputes as to material facts and that these defenses could not be decided on a motion for summary judgment.

The facts, for purposes of summary judgment, are summarized below. GAF is a manufacturer of chemical compounds for use in industry and agriculture. Many of the compounds it markets result from its own research and development efforts. To test agricultural chemicals, nursery and greenhouse facilities are needed. GAF has customarily engaged outside companies having facilities for such testing, among them Amchem. Dr. Anson R. Cooke, Amchem's director of biological research, participated in screening agricultural chemicals for GAF and in preparing reports to GAF of the results.

On March 3, 1965, GAF gave a number of chemicals to Amchem for testing, including 2-chloroethyl phosphonic acid and an ester of that acid. On January 4, 1966, Dr. Cooke informed GAF personnel, including Dr. Randall, that the ester of the acid had shown the remarkable growth regulating property of controlling apical dominance in plants. Apical dominance is the characteristic of some plants to produce a single terminal bud which grows to maturity, inhibiting the growth of other buds and

---

** The Honorable Caleb R. Layton, 3rd, United States District Judge for the District of Delaware, sitting by designation.

1. There is other litigation, including a patent office interference proceeding, pending in the United States between GAF and Amchem over ownership of the now-issued Amchem U.S.

Patent 3,879,188. There is also litigation pending in France, West Germany, and the United Kingdom over ownership of patents issued to Amchem in those jurisdictions.

2. *GAF Corp. v. Amchem Prod., Inc.,* 399 F.Supp. 647 (1975).

thereby limiting crop yields. A compound which would control apical dominance could dramatically increase such yields.

In the months following the January 4, 1966, meeting Dr. Randall analyzed the chemical structure of the ester compound. He became convinced that it was the acid rather than the ester (a combination of alcohol and acid) which was responsible for the control of apical dominance. Dr. Randall discussed this theory with Dr. Cooke, who rejected it because a sample of the acid had been tested as a plant growth regulator and found to be inactive. Dr. Randall, however, reasoned that the original acid sample might have been impure. When his tests confirmed such impurity, he synthesized a second acid sample and on March 6, 1966, delivered it to Amchem for testing. Amchem tested the second sample and on May 25, 1966, reported to GAF that the second acid sample regulated plant growth in a manner equal to the ester. This was significant, since the acid was less costly than the ester.

By September, 1966, Amchem decided to commercialize the acid. To do so it needed to neutralize the corrosive effect of the acid on spraying tanks and equipment. In attempting neutralization, however, Amchem found that a gas evolved which caused the entire mixture to bubble over. Dr. Cooke asked Dr. Randall to find a solution. In November, 1966, Dr. Randall identified the gas being released as ethylene gas. It was already known that ethylene gas possessed plant growth regulative properties. Dr. Randall concluded that the plant growth regulating properties of the acid could be explained because the acid caused the release of ethylene gas. He so informed Dr. Leon Katz, Vice President for Research and Development for GAF, who in turn informed Amchem. Both companies appreciated the significance of the discovery that the acid was an ethylene releasing agent, and both recognized that patent protection should be obtained for it and its related compounds.

Looking at the record evidence in the light most favorable to GAF, as on Am-

chem's motion for summary judgment we must, we note that Dr. Randall discovered between January and March of 1966 that the acid, not the ester, was the regulator, and so informed Dr. Cooke. It appears that in the fall of 1966 Dr. Randall discovered that the acid was an ethylene releasing agent and that Dr. Katz so informed Amchem. Thus it would appear that prior to February 23, 1967, when Amchem filed a United States patent application covering the *use* of the acid as a plant growth regulator, it had information that Dr. Randall had made the two critical discoveries as to such use.

In March of 1966, as a result of the initial interest shown in the ester, the GAF patent department researched the relevant patent law to determine who could file patent applications. They advised the GAF chemists that patent protection could be obtained for novel chemicals, for novel manufacturing processes to produce new or old chemicals, and for novel uses for known chemicals. They advised that, while GAF would normally file applications for new chemicals and new manufacturing processes, new uses ordinarily would be discovered, and use patents filed, by the company doing the plant screening. Neither the basic acid nor the process for its synthesis was new. The patent department concluded that a use patent would be Amchem's property. Because of this advice Dr. Randall also believed that any use patent would belong to Amchem.

With GAF's knowledge Amchem proceeded to prepare and file a use patent application. GAF simultaneously filed patent applications for certain novel compounds relating to the acid. Eventually five separate use applications were filed covering various agricultural uses. In November, 1967, Amchem informed GAF that it was filing foreign applications for all use patents, and on July 12, 1968, it furnished GAF a list of applications it was processing or had completed processing in 24 foreign countries. Thus GAF was at all times aware that Amchem was seeking broad use protection worldwide. GAF was also aware that Am-

chem was undertaking international and domestic marketing.

On May 11, 1970, Walter Kehm was named GAF director of patents. In the course of a review of the company's patent position respecting the acid, he discovered the advice that had been given to Dr. Randall and others that only a plant screener could discover a new use for an old compound. He concluded that this was an error, and on December 21, 1970, he informed GAF and Dr. Randall that Dr. Randall was the inventor and GAF the legal owner of the patents and applications controlled by Amchem. On January 21, 1971, GAF presented to Amchem its claim to the patents. Amchem refused to acknowledge the claim, and numerous lawsuits followed.

In this dispute over ownership of Amchem's foreign patents and applications, the parties agree that Pennsylvania law is controlling.[3] GAF contends that under that law it is the rightful owner since Dr. Randall is the actual inventor and that, acting under mistake, it permitted Amchem to proceed with use applications until it made its claim in January, 1971. As the district court expressed it:

> The first mistake was committed by the attorneys in the GAF patent department when they concluded that only a screener could discover a new use of a non-novel compound. This resulted in a GAF patent inquiry limited to novel chemical and process patents, and also caused Dr. Randall's silence concerning his inventive contributions. The initial mistake led to GAF's second mistake, i. e., its belief that Amchem had discovered the use of the acid.

399 F.Supp. at 654. Amchem responds that if there were mistakes they were non-mutual, that Amchem changed its position in reliance on GAF's prior interpretation of the law, and that estoppel and laches bar relief.

The district court concluded that there was no mutual mistake of law or fact, that GAF had knowledge of the facts, that Amchem relied on a different assumed state of facts to its detriment, and that GAF inexcusably delayed in asserting its rights, to Amchem's prejudice. Thus it concluded that the defenses of estoppel and laches warranted summary judgment for the defendant. Critical to each of these conclusions is the court's assertion that "GAF acknowledges that Amchem had no actual knowledge of Dr. Randall's discovery until 1971,"[4] while at all times GAF is chargeable with such knowledge. For example, the court says that GAF alone made the misinterpretation of the patent law. But if Amchem had the same knowledge of Dr. Randall's role in discovering the plant regulating use of the acid as GAF, then Amchem either made the same mistaken interpretation of the patent law or made a deliberate misrepresentation to the patent office. If Amchem had the same knowledge of Dr. Randall's role in the discovery as GAF, it could hardly have relied on a different assumed set of facts to its detriment. And if Amchem had the same knowledge of Dr. Randall's role in the discovery, it can hardly assert laches for the delay of GAF in calling that role to its attention.

The court's assertion that "GAF acknowledges that Amchem had no actual knowledge of Dr. Randall's discovery until 1971" misstates GAF's position. It claims that Dr. Randall communicated his discovery that the acid, rather than the ester, was the active ingredient to Dr. Cooke prior to May of 1966. There is just as much reason for attributing the knowledge of Amchem's director of biological research, and alleged inventor, to Amchem as there is for attributing Dr. Randall's knowledge to GAF. It claims that Dr. Katz informed Amchem that Dr. Randall had discovered that the acid caused the release of ethylene in the fall of 1966. There is no explanation in the court's opinion as to why the knowledge derived from this disclosure should not be attributed to Amchem. There is in the

---

3. See *Becher v. Contoure Laboratories,* 279 U.S. 388, 49 U.S. 356, 73 L.Ed. 752 (1929).

4. 399 F.Supp. at 658.

record, moreover, a letter from Amchem's Vice President for Research and Development, F. M. Precopio, to the GAF management, urging GAF's approval of a joint article by Drs. Cooke and Randall on the use of the acid to stimulate flowering of pineapple plants. The letter reads:

> The publication, by Cooke and Randall, would establish GAF and Amchem's discovery of the mechanism of action of the compound and its growth regulator activity. The management of the two companies is aware of their contribution, but the scientific community is not.

Certainly this letter alone supports the inference that Amchem's management had knowledge of Dr. Randall's role in the significant discovery disclosed in the use patents. A factfinder might draw a different inference, but on a motion for summary judgment the inference favorable to GAF must prevail.

We think that the evidence of Amchem's knowledge of Dr. Randall's role in the discovery prior to the time it filed the first patent application suffices to preclude summary judgment on its estoppel and laches defenses. GAF also claims that there are material issues of disputed fact with respect to Amchem's reliance and with respect to any prejudice resulting from the delay. We need not explore that contention, since what we have said with respect to Amchem's knowledge requires the reversal of the grant of summary judgment.

The judgment appealed from will be reversed and the case remanded for trial.