**PAN AMERICAN WORLD AIRWAYS, INC.**

v.

**CONTINENTAL BANK.**

**PAN AMERICAN WORLD AIRWAYS, INC.**

v.

**PENN CENTER GROUP, INC. and William F. McGonigal and Frank W. Barnes.**

**Civ. A. Nos. 74–2969, 74–2970.**

United States District Court, E. D. Pennsylvania.

July 5, 1977.

Stephen R. Bolden, Charles C. Coyne, Philadelphia, Pa., for Pan Am.

Lester J. Schaffer, John B. Brumbelow, Philadelphia, Pa., for Continental Bank.

Albert Ring, Philadelphia, Pa., for Penn Center Group, Inc., William F. McGonigal and Frank W. Barnes.

Howard F. Cerney, New York City, for Frank W. Barnes.

## ADJUDICATION

DITTER, District Judge.

These diversity actions arising out of the allegedly fraudulent procurement and use of two air line credit cards were consolidated and tried to the court without a jury.[1] After consideration of the testimony and exhibits presented at trial, I make the following:

## FINDINGS OF FACT

1. Plaintiff, Pan American World Airways, Inc., (hereinafter Pan Am) is a New York corporation engaged in the commercial airline industry with principal offices located in the Pan American Building, New York, New York.

2. Defendant, Continental Bank (hereinafter Continental) is a Pennsylvania corporation engaged in the banking business with principal offices located in Norristown, Pennsylvania.

3. Defendant Frank W. Barnes (hereinafter Barnes) is an individual residing in Montgomery County, Pennsylvania. At all times relevant hereto Barnes was the president or controlling party of Leisurac, Inc. (hereinafter Leisurac) and its subsidiaries, Leisurac World-Wide Travel Service Corp. (hereinafter World-Wide) and Embassy Tours, Inc. (hereinafter Embassy).

4. Defendant, Penn Center Group, Inc. (hereinafter Penn Center) is a Pennsylvania corporation having its principal office in Wayne, Pennsylvania. Although originally formed to engage in various aspects of the financial consulting business, at all times relevant hereto Penn Center was a "dormant" entity having no assets, employees, customers, or clients and engaged in no business activity other than acting as a conduit for Leisurac in the transactions which form the basis of this suit.

5. Defendant William F. McGonigal (hereinafter McGonigal) is an individual residing in Montgomery County, Pennsylvania. At all times relevant hereto McGonigal was the president and controlling party of Penn Center.

6. Barnes formed Leisurac in 1969 to deal in many aspects of the leisure-time industry, including travel agencies, the manufacture of fitness and recreation equipment, and recreation education and consulting services. Although there was some testimony about a division of Leisurac's engaging in the manufacture of recreational equipment at a plant located somewhere in the South, the evidence presented at trial did not establish that Leisurac or any of its subsidiaries were *actively* engaged in any business other than that of operating travel agencies.

7. In November, 1972, Leisurac acquired World-Wide, a Washington, D.C.-based travel agency. Raiford S. Pierce (hereinafter Pierce) who had been an executive and part-owner of World-Wide prior to its acquisition by Leisurac, remained with the company and thereafter managed World-Wide under the direction and control of Barnes.

8. In December, 1972, Leisurac, acquired Embassy, a New York City-based travel agency, and thereafter Embassy was operated under the direction and control of Barnes.

9. The travel agencies operated by Leisurac and its subsidiaries emphasized the provision of travel arrangements and services for business entities (*i. e.* commercial accounts) as opposed to individuals.

10. Leisurac and its subsidiaries extended thirty-day credit terms to their commercial accounts. The travel agencies themselves, however, were required to remit payment to the airlines through which they booked flights on a fifteen-day basis. As a result of this disparity between receipt and disbursement cycles, Leisurac and its sub-

---

1. The only evidence presented at the trial was that offered by plaintiff. At the close of plaintiff's case, the defendants moved for dismissal of the complaints on the grounds that upon the facts and the law plaintiff had failed to show it was entitled to any relief. Although not specifically designated, it is apparent that the defendants intended their motions to be considered as ones for involuntary dismissal under Fed.R. Civ.P. 41(b) and I so treat them. Utilizing the standards for ruling on such motions I have weighed the conflicting evidence presented in plaintiff's case and determined the facts. See 9 *C. Wright & A. Miller, Federal Practice and Procedure* § 2371 (1971).

sidiaries encountered a severe shortage of cash.

11. In the early part of 1973 Barnes became dissatisfied with the services his companies were receiving from Pan Am and issued a directive to his travel-agency employees to book travel accommodations through carriers other than Pan Am whenever possible.

12. William R. Roy (hereinafter Roy) who at all times relevant hereto was Pan Am's vice president of passenger marketing, first became aware of the directive referred to in paragraph 11 in the spring of 1973 when its existence was reported to him by a Pan Am sales support team which had visited World-Wide to determine why the agency's bookings with Pan Am had fallen off significantly. Pierce told the sales support team (which in turn reported to Roy) that the reason for the drop off was the Barnes directive.

13. After learning of this directive, Roy contacted Pierce and arranged to meet with him and Barnes in an effort to iron out the differences between Leisurac and Pan Am. Thereafter, Roy, Pierce, and Barnes held a series of meetings. On these occasions Barnes presented Roy with a number of proposals he wanted Pan Am to accept in return for Leisurac's reversing its policy of shunning Pan Am. In order to alleviate the cash flow problems Barnes wanted Pan Am to extend Leisurac's billing cycle from 15 to 30 days. Barnes also proposed, *inter alia,* that Pan Am pay Leisurac "incentive commissions" or rebates of 17 to 20 percent (in addition to the normal travel agency commission) for all business Leisurac booked on Pan Am over and above a certain quota. Roy took Barnes' various proposals under advisement.

14. Subsequently, at a meeting between Roy and Pierce on June 7, 1973, Roy told Pierce that Pan Am would not pay Leisurac any commissions or rebates above the standard travel agency commission because to do so would violate regulations of the International Air Transport Association (IATA), an organization of which Pan Am was then a member. However, Roy stated that Pan Am would agree to a "brochure program" under which the carrier would pay to Leisurac 10 percent of its total bookings with Pan Am in the form of reimbursement for the cost of printing brochures for tours purportedly sponsored by Leisurac. Roy also told Pierce that Pan Am could not extend Leisurac's billing cycle to 30 days since that also would violate IATA regulations.

15. A meeting of critical importance to this suit was held between Pierce, Barnes, Roy and Michael Shamilzadeh, manager of Pan Am's Atlantic marketing programs, on June 12, 1973. At this meeting Pan Am and Leisurac reached an agreement on a brochure program that would operate for the second half of 1973. The major terms of this agreement were (1) that Leisurac would revise its policy of shunning Pan Am and instead would utilize Pan Am as its exclusive international carrier whenever possible and (2) Pan Am would return to Leisurac 10 percent of its Pan Am bookings that exceeded $1 million. These reimbursements would take the form of payments for the cost of brochures to advertise tours supposedly sponsored by Leisurac. However, it was understood by Roy, Shamilzadeh, Pierce, and Barnes that the brochure program in reality was designed to accomplish the same objective as the incentive commissions or rebates which had been proposed by Barnes. Specifically, Roy, Shamilzadeh, Pierce, and Barnes knew that Pan Am would pay invoices submitted by Leisurac for brochures without making any effort to verify the accuracy of the cost or quantity of brochures actually printed; that Pan Am would make no effort to verify whether Leisurac actually was sponsoring the tours advertised in the brochures; and that the level of reimbursements made to Leisurac would be based on its total volume of Pan Am bookings without regard to the amount of income, if any, generated by the tours purportedly advertised in the brochures.[2]

2. The parties sharply dispute the propriety of this brochure program. Defendants, Barnes,

McGonigal, and Penn Center describe it as a subterfuge that violated the spirit if not the

16. Pursuant to the brochure agreement Pan Am paid $84,500. to Lewis Advertising, Inc., a company controlled by Barnes, during the last six months of 1973.

17. At the June 12 meeting the possibility of Leisurac's utilizing Pan Am's Universal Air Travel Plan (UATP) credit card as a means of solving its cash flow problem by extending its billing cycle beyond 15 days was first discussed. When this matter was brought up, Roy who was unfamiliar with Pan Am's credit card policies, called John A. Makely (hereinafter Makely) Pan Am's director of Atlantic marketing into the meeting. Makely, who was one of Roy's subordinates in the marketing department, had had some prior experience with credit card matters. Makely advised Roy, Pierce, Shamilzadeh, and Barnes that IATA regulations prohibited an airline from issuing a UATP credit card to a travel agency for use by the agency in charging travel accommodations of third parties, i. e. the agency's customers. However, after Makely left the meeting it was agreed by the remaining parties in attendance (i. e. Roy, Shamilzadeh, Barnes and Pierce) that the IATA regulations could be circumvented by Leisurac's applying to Pan Am for a UATP card in the name of a straw (i. e., a company not associated with Leisurac and not engaged in the travel agency business) that would thereafter transfer the card to Leisurac and act as a conduit for purposes of receiving and paying bills for charges placed on the card.

18. As a result of the June 12 meeting with Roy and the other Pan Am officials, on or about June 19, 1973, Barnes called a meeting of Leisurac's executive staff at which time he reversed Leisurac's policy of shunning Pan Am and issued a new directive (Ex. P–20a) which required that accommodations for Leisurac's customers be booked on Pan Am whenever possible.

19. McGonigal and Frank R. Murdock, then the regional vice president of Continental's suburban-west region, were present at the June 19 meeting of Leisurac's executive staff; however Murdock left before the matters detailed in finding No. 20 were discussed.

20. During the course of the June 19 meeting, McGonigal learned that Barnes needed a corporation to act as a conduit in carrying out the plan referred to in finding No. 17 and he volunteered Penn Center for this purpose. Barnes, Pierce, and McGonigal then agreed that they would submit an application for UATP (type A) credit cards in the name of Penn Center as the subscriber and that upon issuance, the cards would be transferred to Leisurac and used by its subsidiaries, Embassy in New York and World-Wide in Washington, D.C., to charge travel accommodations for Leisurac's customers.

21. No employee of Pan Am was present at the meeting referred to in the preceding paragraph. However, on the basis of the meeting held on June 12, 1973 (see finding No. 17), Pan Am employees Roy and Shamilzadeh were aware of the fact that Leisurac would submit an application for UATP cards using a straw corporation.

22. Shortly after the June 19 meeting Pierce obtained from Shamilzadeh an application for the UATP credit cards. Subsequently Barnes or someone acting under his express direction, filled out the application, listing Penn Center as the applicant and giving materially false and misleading information as to the business activities and

letter of the IATA regulations, this characterization apparently designed to show that Pan Am was ready and willing to violate such regulations whenever it believed it in its best interests to do so. Plaintiff, on the other hand, while not seriously disputing that the brochure program allowed them to accomplish the same result as the incentive commissions suggested by Barnes—the payment of commissions in excess of the standard rates—seems to suggest that the regulations contained a loophole that allowed them to utilize such a program and that its taking advantage of this loophole was no more improper than, say, a taxpayer making full use of the loopholes in the tax laws. Since they have not furnished the court with either the regulations themselves or any authoritative interpretation of them it is impossible for me to determine which party's characterization is more nearly accurate. In any event, such a determination is unnecessary to my decision.

financial status of Penn Center. McGonigal knew that the information contained in this application was materially false.

23. Sometime between June 19, 1973, and August 9, 1973, the falsely completed credit card application (Ex. P–1) was submitted to Shamilzadeh at Pan Am. On or about August 9, 1973, Shamilzadeh returned the application to Pierce because it had not been signed. Thereafter Pierce, acting under the express direction of Barnes, signed the application in the name of McGonigal as president of Penn Center and returned it to Shamilzadeh.

24. On or about August 20, 1973, Shamilzadeh forwarded the credit card application of Penn Center to Phillip Baressi, the manager of Pan Am's credit department, along with a covering memorandum which stated as a reason for recommending approval of the application, "we [Pan Am] have recently concluded an agreement with this Company [Penn Center] to be their sole world wide carrier." Ex. P–18. Pan Am never had any such agreement with Penn Center,—the agreement referred to in this memorandum was that between Pan Am and Leisurac discussed in finding No. 15.

25. The credit card application listed Continental and its employees Murdock and Roland Grey as "bank references."

26. No employee of Pan Am's marketing department (i. e., Roy, Makely, Shamilzadeh) had authority to override a decision of Pan Am's credit department as to whether or not a UATP card should be issued to a particular applicant or to order the issuance of a UATP card without first obtaining the approval of the credit department.

27. Sometime between August 20, 1973, and September 7, 1973, the credit department of Pan Am rejected the application of Penn Center.

28. Thereafter Barnes was notified that Pan Am's credit department had rejected the application because of a lack of information about Penn Center. Barnes called Roy and told him that Pan Am's credit department did not have accurate information on Penn Center and requested Roy have the credit department contact Murdock at Continental to verify Penn Center's credit-worthiness. Roy relayed this information to Baressi through Shamilzadeh, suggesting that Baressi investigate Penn Center further before rejecting its application.

29. After learning that the credit application had been refused, Barnes and McGonigal set about to create an "identity" for Penn Center. Sometime in August, 1973, Barnes, McGonigal, and Nate Gordon (Leisurac's chief financial officer) had a meeting at which they prepared a false business and financial picture of Penn Center which was then submitted to Dun & Bradstreet.

30. Dun & Bradstreet prepared a report based on the information supplied by McGonigal and Barnes. On or about September 7, 1973, McGonigal sent a copy of this report to Shamilzadeh who forwarded it to Baressi. This report stated falsely that Penn Center was engaged in substantial business activity as a financial management service. (Ex. P–9).

31. On or about September 11, 1973, McGonigal, acting at the direction of Barnes, opened a checking account at Continental in the name of Penn Center and contemporaneously mentioned to Murdock that he had done so and that Penn Center, theretofore a dormant corporation, was then being activated.

32. The checking account was opened with an initial deposit of $438.60, substantially all of which was Leisurac's money supplied to McGonigal by Barnes. Subsequently McGonigal made deposits to this account of $10,580. on September 13, 1973, $10,000. on September 20, 1973, and $10,000. on October 3, 1973, again using Leisurac's money supplied to him by Barnes.

33. Sometime after August 20, 1973, and prior to September 18, 1973, as part of his credit investigation, Baressi sent a form letter to Continental's credit department, requesting credit information on Penn Center.

34. In response to Baressi's request, Continental's employee, Ian R. Harvey, ad-

vised plaintiff by letter dated September 18, 1973, that Penn Center had opened an account with Continental on September 11, 1973, and that because of the newness of the account average balances had not yet been computed, but that the account was expected to "average in good four figure proportions" (Ex. P–5). Harvey's letter also stated that the president of Penn Center [McGonigal] had other related accounts with Continental and that these were maintained in a very satisfactory manner. The prediction of average account balances and the statement as to other accounts maintained by McGonigal were based on information given to Harvey by Murdock, who had handled much of McGonigal's other banking business with Continental.

35. At the time he gave Harvey the information referred to in the preceding finding, Murdock knew it was to be released in connection with a credit inquiry concerning Penn Center.

36. As of the time he gave Harvey the information referred to in finding No. 34, Murdock was aware that:

a) he had known McGonigal for approximately one year, their relationship having developed in connection with McGonigal's use of Continental's banking services for the local office of Pacific Mutual Insurance Company of which McGonigal was manager;

b) in connection with his insurance business McGonigal had referred some trust and estate business to Continental's trust department;

c) McGonigal had recently opened a checking account at Continental in the name of Penn Center before which Penn Center had been a dormant corporation;

d) Continental's policy was to refrain from giving average balances on accounts less than three months old;

e) Continental had outstanding approximately $75,000. in personal loans to McGonigal, on which the interest payments had been kept current but the principal had been reduced by no more than $10,000.

37. Shortly after receipt of Penn Center's credit card application, Baressi obtained directly from Dun & Bradstreet a report (Ex. P–23) which stated that it (Dun & Bradstreet) had no information as to the business activity or financial status of Penn Center.

38. On the basis of the information contained in Harvey's letter of September 18 and the lack of information in the report he had ordered directly from Dun & Bradstreet, Baressi again decided to reject the Penn Center application for UATP cards on the grounds that it was not sufficiently creditworthy to possess such cards.

39. On September 21, 1973, Murdock sent a letter to Baressi for the purpose of making a "correction" in Harvey's letter of September 18, 1973. This second letter stated that Penn Center's account at Continental had been opened on September 11, 1973, with a "medium four figure amount"; that the account's balances were expected to average "in the moderate five figures" and not four figures as reported in Harvey's letter; and that the present balance of the account was "in a moderate five figure amount." (Ex. P–60).

40. At the time of writing his September 21, 1973, letter Murdock knew that it would be considered by Pan Am in determining whether or not to extend credit to Penn Center.

41. At the time of writing his September 21, 1973, letter Murdock had known Barnes for approximately one year; knew that Barnes controlled Leisurac and its subsidiaries; knew that Continental had made loans of $25,000. each to Barnes personally and to Leisurac; and was aware in a general way that Continental had entered into financing arrangements with both Leisurac and World–Wide pursuant to which Continental had a security interest in the accounts receivable of these agencies.

42. At the time Murdock wrote his letter of September 21, 1973, he also was aware of all the information listed in finding No. 36 and, in addition, knew or easily could have ascertained that:

a) the Penn Center account had been opened with a starting balance of $438.60; and

b) the present balance in the Penn Center account was $20,593.60 (Ex. P–15).

43. On or about October 1, 1973, Murdock had a telephone conversation with Harvey Odze, another employee of Pan Am's credit department, concerning Penn Center. In this conversation Murdock told Odze that Penn Center's account with the bank had been opened in August, 1973; average balances were in moderate five figures and were expected to go to moderate six figures; McGonigal had referred a lot of good business to Continental; McGonigal was quite well-known and respected in the Philadelphia area; and both Murdock and the bank thought very highly of McGonigal.

44. At the time Murdock made the statements referred to in finding No. 43, he was aware of all the information listed in findings Nos. 36 and 40 through 42.

45. Murdock did not write the letter of September 21 nor make the telephone call of October 1 on his own initiative as part of his normal duties at Continental. Rather the letter and telephone call were initiated by Murdock at the express request of Barnes or McGonigal or someone acting under their direction.

46. It is a customary business function of banks such as Continental to provide credit information about their customers to third parties such as Pan Am and as a regional vice-president of Continental, Murdock had actual or apparent authority to provide the information contained in the letters of September 18 and 21 and the telephone call of October 1, 1973.

47. The employees of Pan Am's credit department honestly and reasonably believed the information provided by Continental about Penn Center to be that of a disinterested party.

48. Although the evidence might support a contrary conclusion, I do not find that Murdock was a participant in the scheme to obtain UATP cards for Leisurac's use or that he intended to further that

scheme in making the statements contained in the letters of September 18 and 21 or the telephone conversation of October 1, 1973. Nonetheless, taken as a whole, these letters and telephone call were materially false and misleading in that:

a) the Penn Center account had been opened on September 11, 1973, not in August, 1973, as stated in Murdock's phone call to Odze;

b) the Penn Center account had been opened with a three-figure amount (i. e. $438.60), not a medium four figure amount as stated in the letter of September 21, 1973;

c) the balance in the account as of September 21, 1973, was in the low five figure range (i. e. $20,593.60) not a moderate five figure amount as stated in the letter of September 21, 1973;

d) Murdock failed to disclose that (i) he and Continental had known McGonigal for only slightly over one year, (ii) that immediately prior to opening up its account with Continental, Penn Center had been a dormant corporation and (iii) that McGonigal then had outstanding loans from Continental approximating $75,000. on which the principal had been reduced by no more than $10,000.; and

e) Murdock knew that he had insufficient information upon which to base any predictions as to what Penn Center's account balances would average.

49. On the basis of the information contained in Murdock's letter of September 21, 1973, and his telephone call with Odze of October 1, 1973, Baressi reversed his earlier decision and approved the issuance of the UATP cards to Penn Center.

50. Baressi's decision to issue the UATP cards to Penn Center was based upon its application for these cards and the information which he had developed during his credit check and not upon any other agreement between Pan Am and Leisurac.

51. Prior to approving the application for the cards, neither Baressi nor anyone else in Pan Am's credit department conducted any other investigation of Penn Cen-

ter beyond reviewing the application, checking with Continental, and ordering a Dun & Bradstreet report (Ex. P-23). In particular no effort was made to:

a) contact trade references listed in the application;

b) verify that Penn Center had a net worth of $280,000., paid in capital of $50,000., surplus and retained earnings of $230,000. and 1972 sales of $767,000., as listed on the application;

c) certify the nature of Penn Center's business;

d) contact banking institutions utilized by Penn Center prior to Continental, even though the application stated that it had been organized on April 10, 1971, and Baressi knew that the Continental account had not been opened prior to August 1973.

52. On or about October 4, 1973, two UATP cards were issued to Penn Center.

53. Thereafter, one card was delivered to World-Wide and the other to Embassy and were used by these agencies to charge travel accommodations for their customers.

54. The present balance due and owing to Pan Am on the two UATP cards is $463,234.79, which represents credit extended to Leisurac or its subsidiaries by the use of the cards between the date they were issued and May 8, 1974, when they were cancelled for default in payment.

55. No employee of Pan Am's credit department was aware of the scheme referred to in finding No. 17 or that Penn Center was a straw corporation utilized to effectuate that scheme. However, prior to the issuance of the UATP cards Pan Am marketing department employees Roy and Shamilzadeh were aware of this information, but did not communicate it to Pan Am's credit department.

56. In the normal course of Pan Am's business the use of a UATP credit card does not impose liability on a corporate entity's principals and controlling persons—only the entity itself is liable.

57. The evidence is insufficient to show that either at the time the scheme referred to in finding No. 17 was formulated or at the time the credit cards were issued Barnes and McGonigal intended or expected that Leisurac would not be able to pay for all charges placed against such cards by it or its subsidiaries.

## DISCUSSION

As my findings make clear, defendants Barnes and McGonigal plainly engaged in a scheme to obtain UATP credit cards for a travel agency (Leisurac) in violation of IATA regulations through the use of a straw corporation, Penn Center. And, while not a participant in the scheme itself, Continental, through its agent Murdock, provided Pan Am with false and misleading representations as to Penn Center's financial status and reliability. It therefore is entirely possible that the conduct of these defendants *vel non* would be sufficient to subject them to liability to Pan Am for deceit,[3] or in the case of Continental, for negligent misrepresentation.[4] However, it is unnecessary for me to decide these questions. because my additional findings that Pan Am officials Roy and Shamilzadeh had knowledge of and participated in the scheme precludes plaintiff's recovering in any event.

The courts of Pennsylvania[5] have recognized that a corporation can acquire knowledge only through its officers and agents, and have followed the general rule that the knowledge of high-ranking corporate officials must be imputed to the corporation itself. See *GAF Corporation v. Amchem Products, Inc.*, 399 F.Supp. 647, 656 (E.D.Pa. 1975); *Corn Exchange National Bank & Trust Co. v. Burkhart*, 401 Pa. 535, 165 A.2d

---

3. See generally *Restatement, Second, Torts* § 525 et seq. (1977).

4. See generally *Restatement, Second, Torts* § 552, particularly at comment *d* and illustration *11*; but cf. *id.* at § 552A.

5. In the absence of suggestions to the contrary, I have assumed the parties agree that this controversy is governed by the law of Pennsylvania.

612 (1960); *Gordon v. Continental Casualty Co.,* 319 Pa. 555, 181 A. 574 (1935); *A. Schulman, Inc. v. Baer Co., Inc.,* 197 Pa.Super. 429, 178 A.2d 794 (1962); and generally 19 C.J.S. *Corporations* § 1078 (1940). However, this rule applies only where the knowledge relates to a matter within the scope of the agent's authority, *St. Louis Fire & Marine Ins. Co. v. Witney,* 96 F.Supp. 555, 561–62 (M.D.Pa.1951), or upon which he has a duty to communicate with his principal, *Schulman, supra* 197 Pa.Super. at 434, 178 A.2d 794.

> Notice to an officer or agent is notice to the corporation only where the matter with reference to which notice is given or acquired is within the scope of his authority and has some direct connection with his agency, and the notice or knowledge comes to, or is possessed by, him in his official or representative capacity, and where the officer or agent in the line of his duty ought, and could reasonably be expected, to act on the knowledge or communicate it to the corporation; and hence the corporation is not affected with knowledge which the officer or agent acquires while not acting within his authority, or which relates to matters not within the scope of his authority. . . .

19 C.J.S. *Corporations* § 1081, at 618; see *Restatement, Second, Agency* §§ 272, 275 (1958).

Although the plaintiff has not specifically raised the point, in view of my findings Nos. 26 and 55, it is important to note that this is not a case in which Roy and Schamilzadeh's knowledge of the scheme arose from activities outside the scope of their authority. While it is true that no employee of Pan Am's credit department was aware of what was being done and that the employees of the marketing department (*i. e.* Roy, Makely, and Shamilzadeh) had no authority to order the issuance of UATP cards, the scheme was developed to help resolve a situation properly within their purview.

Leisurac was engaging in what amounted to a boycott of Pan Am. Despite Roy's testimony that this boycott would have had little effect on Pan Am's business, he was concerned enough to arrange a series of meetings with Barnes to consider the latter's grievances against the airline, one of which was Leisurac's cash problem resulting from Pan Am's fifteen-day billing cycle. The negotiations resulted in agreement on specific proposals that benefitted both Leisurac and Pan Am. Pan Am agreed to pay what amounted to higher commissions through the brochure program and to alleviate Leisurac's cash problems through the use of the UATP cards. Leisurac, on the other hand, agreed to place all possible business with Pan Am. In considering the scope of Roy's authority, and that of Shamilzadeh, to decide whether their knowledge should be imputed to the corporation these agreements must be considered together. Compare *Bangor & Portland Railway Co. v. American Bangor Slate Co.,* 203 Pa. 6, 52 A. 40 (1902). From the point of view of Pan Am the overall objective of the various agreements was to reestablish friendly relations with Leisurac and thereby increase sales through that agency, surely a proper function of Pan Am's marketing department.

Moreover, Shamilzadeh and particularly Roy were hardly low level employees buried deep within the hold of Pan Am's corporate ship; on the contrary they occupied responsible managerial positions on the bridge. And this is not a case where these men had reason to believe that the information they possessed about Penn Center's application would be unimportant to the credit department. Compare *Restatement, Second, Agency* § 275, comment *d* and illustration *8.* They knew that Pan Am's credit department would believe that Penn Center was applying for the cards and would evaluate its financial standing in determining whether or not to issue them. Under all the circumstances, Roy and Shamilzadeh quite clearly had a duty to communicate their knowledge of the scheme to the credit department. See *Schulman, supra* 197 Pa.Super. at 434, 178 A.2d 794; *cf. Restatement, Second, Agency* § 381. Plaintiff's argument that it is inappropriate to apply the rule of imputed knowledge in the context of

a "large corporate entity . . . with many departments . . . [that] act independently of each other," Plaintiff's Trial Brief at 12, is without merit. The very point of the rule is to preclude "large corporate entities" from shielding themselves from responsibility by pleading ignorance of actions taken or knowledge possessed by their high-ranking officials. See *GAF, supra* at 656.

An exception to the rule that the knowledge of a corporate agent is imputed to the corporation is recognized where the agent is acting adversely to the interest of the corporation. See *Restatement, Second, Agency* § 282. Plaintiff's primary argument in support of its right to recovery is that it is entitled to take advantage of this exception because, it argues, in participating in the scheme to obtain UATP cards for Leisurac, Roy and Shamilzadeh were not acting in the interests of Pan Am. I disagree.

In *Gordon, supra,* the leading Pennsylvania case on this point, a bank receiver sought to recover on a bond issued to protect the bank from loss due to dishonesty by its employees. The bonding company defended on the grounds that in procuring the bond the bank's secretary-treasurer falsely represented that it had sustained no loss through employee dishonesty during the preceding five years, whereas in fact he had been embezzling the bank's funds. The bank's position, which had been sustained by the lower court, was that it was not visited with the knowledge of its secretary-treasurer's defalcation because he had been acting adversely to its interest. The Supreme Court reversed. In holding that the secretary-treasurer's knowledge was chargeable to the bank, thus precluding its recovery on the bond, the court recognized that although he was acting adversely to the bank in embezzling its money he was not acting adversely to it in obtaining the bond.

In procuring the bond Mathews [the secretary-treasurer] was not acting adversely to the bank, but in its behalf. The adverse act of embezzling the money had been consummated previously; in that transaction—the act of embezzlement—his knowledge of his own dishonesty did not carry through him to the bank, because he was then acting adversely to its interests. In arranging for the bond, however, this was not the case. 319 Pa. at 560–61, 181 A. [574] at 576.[6] See also *First National Bank v. Aetna Casualty and Surety Co.,* 105 F.2d 339 (3d Cir. 1939). Although the facts of *Gordon* are distinguishable from the case at bar its holding would seem to apply *a fortiori* here because Roy, Makely, and Shamilzadeh simply *never* were acting "adversely" to Pan Am within the meaning of the adverse interest exception to the imputed knowledge rule. In arguing to the contrary, plaintiff has misconceived the nature of this exception. *Restatement, Second, Agency* § 282 states:

(1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal *and entirely for his own or another's purposes.* (Emphasis added).

There is absolutely no evidence that Roy or Shamilzadeh had anything to gain individually from participating in the scheme to obtain UATP cards for Leisurac or that they had any desire to advance its interests at the expense of Pan Am.[7] The authori-

6. Plaintiff seeks to distinguish this case from *Gordon* on the grounds that here Pan Am is not seeking to obtain the benefit of a fraud perpetrated by its agent upon the defendants. But while it is true that none of the defendants here have been defrauded, the important point is that *neither has Pan Am.* Since the knowledge of Roy and Shamilzadeh is imputed to the airline it is deemed to have known all along that it was dealing with Leisurac and thus cannot claim to have been deceived by the scheme. See *National Refining Co. v. Continental Devel-*

*opment Corp.,* 354 Mo. 402, 189 S.W.2d 551, 554 (1945); 37 C.J.S. *Fraud* § 27 (1943).

7. Of course Roy and the others were no doubt promoting their own interests in the sense that if the various agreements with Leisurac proved successful and Pan Am's sales were thereby increased, they would be rewarded by Pan Am (*i. e.,* by promotions, salary increases, etc.), but such motivation cannot be characterized as adverse to the interests of the airline. Cf. *Re-*

ties relied upon by plaintiff are readily distinguishable on this basis. As noted in a comment to the Restatement, "[t]he mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." *Restatement, Second, Agency* § 282, comment *b*; see *In re Mifflin Chemical Corp.*, 123 F.2d 311 (3d Cir. 1941), cert. denied sub nom., *Sheridan v. Rothensies*, 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213 (1942) (applying federal law).

From all that appears, Roy and Shamilzadeh acted solely to further what they believed to be the best interest of Pan Am: the alleviation of Leisurac's cash-flow problems, thereby encouraging that agency to book more flights with Pan Am. The fact that their assessment of what was in Pan Am's best interest turned out to be wrong does not mean that the airline now can disavow knowledge of their actions.[8] *Cf. Sisney v. Diffenderfffer*, 323 Pa. 337, 343, 185 A. 830 (1936).

Although involving the application of Missouri law, a case very nearly on all fours with the one *sub judice* is *National Refining Co. v. Continental Development Corp.*, 354 Mo. 402, 189 S.W.2d 551 (1945). In that case certain real estate had been sold to one Zuckerman as a straw purchaser for a third party. Plaintiff's agent in carrying out the sale was aware of the fact that Zuckerman had no real interest in the property. When the purchase money mortgage held by plaintiff fell into default, it foreclosed on the property and then attempted to recover a deficiency judgment against Zuckerman. The court held that this could not be done. In reaching its decision, the court first concluded that plaintiff was chargeable with its agent's knowledge of the transaction, rejecting much the same adverse interest argument as that advanced here:

statement, *Second, Agency*, Appendix to § 282, at p. 488.

8. Neither does the fact that the scheme was improper because it violated IATA regulations mean that in participating in it Roy and Shamilzadeh were acting adversely to Pan Am.

He [the agent] knew that she [Zuckerman] was a stenographer in the real estate office and had no actual interest in any property transferred to her and he knew that she often executed notes and deeds of trust under such circumstances. The consequence is that the National Refining Company had whatever knowledge Thornhill had, even though he did not inform the company of all the facts—unless he was guilty of fraud or collusion and acted contrary to the interest of his employer. 3 C.J.S. Agency §§ 262, 265, 269; 1 Restatement, Agency, Secs. 274, 275, 282. "Plaintiff knew that Padfield was financially irresponsible, that he was a 'straw man.' We say he knew it because his agent, Altheimer knew it." *Fuchs v. Leahy*, 321 Mo. 47, 57, 9 S.W.2d 897, 901.

Thornhill, as the trial court found, was not a party to a fraudulent scheme or personally and financially interested in the transaction adversely to the interests of his principal—a finding which would have exonerated the refining company of Thornhill's knowledge. *Smith v. Boyd*, 162 Mo. 146, 62 S.W. 439; *Traber v. Hicks*, 131 Mo. 180, 32 S.W. 1145; *Van Raalte v. Epstein*, 202 Mo. 173, 99 S.W. 1077. His only financial interest was in his commission from his principal, one-half of which he agreed to and did refund when it became necessary to foreclose the deed of trust and the purchase price was not paid.

354 Mo. 402, 189 S.W.2d at 554. Turning to the ultimate issue, the court wrote:

It is our view of the case that the only conduct upon which the appellant ultimately relies as constituting fraud is the "straw" nature of the transactions. And, in as much as the refining company had the knowledge its agent had, that Miss Zuckerman was a "straw" party in both

Such a construction of the adverse interest exception would mean that a corporation could never be held accountable for improper or even illegal conduct pursued by its agents in its behalf. *Cf. Mifflin, supra; Burkhart, supra.*

the note and deed of trust transaction and holding title to the six parcels of real estate, there was no reliance upon her solvency, or her ownership of other land as additional security for the payment of the purchase price of the filling station and consequently there could be no estoppel (37 C.J.S. Fraudulent Conveyances § 25) and the transfer was not fraudulent.

*Id.*, 189 S.W.2d at 554. In the absence of binding Pennsylvania authority on the point, I find the reasoning of *National Refining* persuasive and believe that the courts of Pennsylvania would follow its holding if faced with the same question. Indeed, in *Burkhart, supra,* the Pennsylvania Supreme Court has already provided a clear indication of how it would rule on the issue presented here.

*Burkhart* involved an alleged "straw man" transaction not unlike that presented in *National Refining* or in the case at bar. The plaintiff bank sued the defendant for breach of warranty of title as the lessor of certain bailment leases which had been assigned by him to the bank. The defense was that the bank knew all along that the lessee was the real owner of the machinery covered by the lease, the transaction having been structured as a bailment lease rather than a chattel mortgage in order to allow the bank greater interest than it could lawfully obtain in the latter type of transaction. The precise issue presented to the Supreme Court was an evidentiary question: whether the lower court erred in refusing to allow the lessee to testify concerning negotiations with the bank's vice president on the grounds, *inter alia,* that the testimony would be irrelevant because the bank would not be bound by such negotiations. The Supreme Court reversed, holding that the proffered testimony should have been received. Chief Justice Jones explained the trial court's error as follows:

As support for the further ruling that knowledge of the bank's agent, vice president Furey, concerning the transaction could not be imputed to the bank, the court below relied upon the decision in *First National Bank of Hooversville v.*

*Sagerson,* 283 Pa. 406, 129 A. 333. In that case judgment had been confessed against Sagerson and others on two judgment notes, payable to the plaintiff banks, and whereof he was a co-maker. On Sagerson's petition to open the judgment so far as he was concerned and to permit him to make a defense, the prayer of his petition was granted and a jury trial awarded, which resulted in verdicts in Sagerson's favor against the two bank plaintiffs, whereon judgments were entered. At the trial Sagerson was permitted to introduce testimony showing that the president of the payee banks told him, before he signed the notes that the sole purpose of the notes was to deceive the bank examiner and that the banks would not hold him liable on the notes. On appeal by the plaintiffs, this court reversed, holding that the testimony proffered by Sagerson was inadmissible on the ground that, when a party to a transaction acts in collusion with an officer of a bank, or knows or should know that the officer is acting beyond his authority and contrary to the best interests of the bank, the knowledge of the bank officer in such regard cannot be imputed to the bank.

In the instant case, however, it is Burkhart's [the defendant's] contention that he did not know nor should he have known, that the vice president Furey was acting outside of his authority or against the interest of the plaintiff bank. On the contrary, the proffered testimony was intended to show that the primary purpose of the fictitious bailment lease arrangement was for the benefit, and therefore in the interest, of the plaintiff bank. *If such should be established, then the general rule applies that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal.*

401 Pa. at 544–45, 165 A.2d [612] at 616 (emphasis added). I believe the clear import of *Burkhart* is that the Pennsylvania Supreme Court would follow the rationale of *National Refining* and would not allow a corporation such as Pan Am to cry foul

when a straw transaction entered into with the knowledge and participation of its own high-ranking officials goes awry.

The evidence is essentially[9] undisputed that in the ordinary UATP contract only the named subscriber of the card is responsible for payment of charges placed thereon. Principals, controlling parties, or related entities of the subscriber are not liable on the card in the absence of an agreement to the contrary, which has not been shown here.[10] Since responsible officials of Pan Am knew that Leisurac was the real party in interest on the UATP contract and their knowledge is imputed to the corporation, it follows that "there was no reliance upon [Barnes, McGonigal or Penn Center's] solvency" . . . and therefore no fraud. *National Refining, supra* 354 Mo. 402, 189 S.W.2d at 554. Thus, plaintiff's only recourse is on its implied contract with Leisurac.

Accordingly, I make the following:

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action and venue is properly laid in the Eastern District of Pennsylvania.

2. This controversy is governed by the law of Pennsylvania.

3. In participating in the scheme to obtain UATP cards for Leisurac through the use of a straw corporation, Penn Center, Pan Am employees Roy and Shamilzadeh were acting within the scope of their actual or apparent authority as agents of plaintiff.

4. In participating in the scheme referred to in the preceding conclusion, Roy and Shamilzadeh were not acting "adversely" to the interests of Pan Am.

5. The knowledge of Roy and Shamilzadeh with respect to the scheme at issue in this case is imputed to plaintiff Pan Am.

6. Since Pan Am is deemed to have known that Leisurac was the real party in interest on the UATP contract it was not deceived by the scheme at issue in this case. Pan Am was not relying on the financial status of Penn Center, but instead on that of Leisurac.

7. Because Pan Am was not deceived by the scheme it cannot recover against defendants Barnes, McGonigal, Penn Center, and Continental and judgment must be entered in favor of these defendants.

---

9. There was some testimony to the effect that the traveler actually receiving the benefit of a charged flight might also be liable for payment if it were not made by the subscriber; however no such parties are named as defendants and so I need not consider that possibility.

10. Even though plaintiff is charged with knowledge that it was dealing with Leisurac, it might nonetheless be able to recover against Barnes and perhaps McGonigal and Penn Center also, if piercing Leisurac's corporate veil would be appropriate. No such circumstances have been proved. See finding No. 57.